DETERMINED IN THE

# COURT OF APPEALS

OF THE

# STATE OF NEW YORK,

At the September Term, A. D. 1865.

---

THE CITY OF UTICA *v.* G. CLARENCE CHURCHILL and others.

ADAM VAN ALLEN *v.* MICHAEL A. NOLAN and others, THE BOARD OF ASSESSORS OF THE CITY OF ALBANY.

CHAUNCEY F. WILLIAMS and others *v.* THE SAME.

The interests of the stockholders in the National Banks, organized under the act of congress of June 3, 1864, are legally taxable for State, county and municipal purposes pursuant to the laws of this State.

The objection that these moneyed institutions are instrumentalities of the general government for the execution of its constitutional powers, and are exempt from State taxation upon the principle by which the late Bank of the United States was adjudged to be exempt, does not apply where, as in these cases, the tax, instead of being assessed against the corporation, is against the individual stockholders.

The last position was authoritatively adjudged by the Supreme Court of the United States in the case of *Osborn* v. *The Bank of the United States* (9 Wheat., 738).

It is moreover expressly enacted by the 41st section of the aforesaid act of congress, that these stockholders may be taxed under State authority.

The stockholders are not exempt from taxation though the capital of the banks be invested in the securities of the public debt of the United States.

Taxes are imposed upon the owners of property in respect of or on account of such ownership. Hence, where a certain kind of property is declared by the Constitution or by law to be exempt from taxation, the exemption is conferred upon such owners; but the stockholders are not in a legal sense the owners of the securities held by the bank. Their interest is of a collateral nature, and is not the interest of an owner.

The 41st section of the congressional banking act, declaring the stockholders subject to State taxation, applies, though the capital be invested in national securities; for it is a condition to the existence of these banks that they shall hold a large amount of those securities.

Notwithstanding the principle that national stocks are generally exempt from State taxation, it is constitutionally competent for congress to negotiate a loan under conditions that the holders of the script shall be subject to taxation by the State of which they are citizens. This has been done by the said 41st section, so far as stockholders in the national banks can be considered as the owners of the public stock held by such banks.

The act of the legislature of this State (Laws 1865, p. 172), subjecting the stockholders of national banks to taxation at the place where the bank is located, applies to such banks organized under the banking act of congress of 1863, equally with those organized under the act of congress of 1864.

By the laws of this State existing prior to the act of the legislature above mentioned, stockholders in national banks could not be taxed except in the town or ward in which they resided.

The limitations prescribed in the before mentioned 41st section, were not exceeded by the above mentioned act of the legislature of this State.

THE questions involved in this action were brought to a hearing in the first instance at a General Term of the Supreme Court, in the fifth judicial district of this State, upon a case submitted in pursuance of the provisions of section 372 of the Code of Procedure. The points in controversy being substantially whether or not certain taxes imposed by the city of Utica upon the stockholders of the Second National Bank of Utica, upon the several shares held by the respective stockholders in such bank, were legally imposed, and whether payment of the same could be legally enforced.

The bank is situated in the first ward of the city of Utica, and several of the stockholders were assessed in said ward, whether residing therein or elsewhere. At the time the assessment was made, the defendant Churchill resided in the first ward; Brayton resided in the city of Utica, but not in the first ward; Walcott resided in the county, but out of the city and ward; Foot resided in the State, but out of the ward, city and county; and Miller resided out of the State, and at Washington, D. C.

The cause was argued at the January Term, 1865, and at April Term, 1865, and judgment was rendered against the defendant Churchill only in the first of the above cases, and

in favor of the plaintiffs in each of the two others. (See opinion, per DENIO, Ch. J.)

In pursuance of section 372 of the Code of Procedure, the parties to this action agreed to a case presenting, in substance, these facts: *First.* The existence of the Second National Bank of Utica, properly organized under the act of congress of February 25, 1863, &c. *Second.* The due filing in the comptroller's office at Washington, in December, 1863, the proper certificate of incorporation. *Third.* The issuing by said comptroller, of his official certificate authorizing said bank to commence its business under said act of congress. *Fourth.* The amount of its capital and the number of its shares. *Fifth.* The defendants were severally stockholders in said bank, and the amount each possessed. *Sixth.* The location of said bank in said first ward, and the several places of residence of the several defendants. *Seventh.* That the defendants, except Churchill, had no goods, &c., in said ward. *Eighth.* The legal existence and exercise of the office of assessor in said ward. *Ninth.* The investment of the capital of the bank in "FIVE-TWENTY BONDS," &c., at the time of the assessment. *Tenth.* The proportionate amount of such investment. *Eleventh.* The proper making of the assessment roll by the assessors of Utica, and the names and residences of the stockholders of said bank. *Twelfth* and *Thirteenth.* The asssessment of their stocks in such bank. *Fourteenth.* The making and delivery of the proper warrant to the collector. *Fifteenth.* His return of the same that the defendants' tax was wholly unpaid, &c. *Sixteenth.* That these defendants were not elsewhere assessed, &c.

*F. Kernan,* for the City of Utica.

I. The shares of stock created and issued by the national banks are personal property; and the owners are liable to taxation on account of the same under the laws of the State, unless they are exempted by the Constitution and laws of the United States. (National Bank Act of Feb. 25, 1863, § 12, found in the U. S. Statutes for 1862, 1863, p. 668; Act of June 3, 1864, § 12, found in U. S. Statutes for 1863, 1864, p. 102;

*Hutchins* v. *State Bank*, 12 Metc., 426, per SHAW; *Slaymaker* v. *Bank of Gettysburgh*, 10 Barr, 373; 23 N. Y., 219, 220, per COMSTOCK; 1 R. S., 1st ed., 387, 388, §§ 1, 4; id., 5th ed., 905, 906, §§ 1, 4.)

II. The defendants are not exempted by the Constitution of the United States from taxation under State authority for and on account of the shares of the stock of the bank owned by them respectively.

1. The most that can be justly claimed from the adjudications on the subject is, that the corporation, being an instrument or agency of the federal government, is not, unless subjected thereto by that government, liable to taxation by State authority; the State cannot tax the corporation for or on account of its business or property; nor for or on account of the bonds or other securities issued by the United States and owned by the corporation. (*McCullough* v. *The State of Maryland*, 4 Wheat., 316; *Osborn* v. *U. S. Bank*, 9 id., 738; *Weston* v. *City Council of Charleston*, 9 Pet., 449; *Bank of Commerce* v. *Tax Commissioners*, 2 Black., 620.)

2. The tax in question is not upon the corporation or its business. It is not upon the capital of the bank, or upon the United States bonds or other property owned by the corporation.

3. The tax is upon the defendants as individuals, for and on account of personal property owned by them severally.

(1.) This personal property is called stock, or shares of stock. It is created by the corporation; the individual purchases it from the corporation. The money which he pays to the corporation for it becomes the money of the corporation, and the shares of stock his individual property. It is personal estate owned by him absolutely, and of the character of a chose in action. (See authorities on point I.)

(2.) The property does not partake of the nature or character of the property in which the capital of the corporation is invested. Notwithstanding the entire capital and property of the corporation were invested in land, the stock owned by the shareholder would be personal estate. (2 Kent's Com., 4th ed., 341, note *a*; Hilliard's Abr., vol. 1, p. 18.)

(3.) The defendants have no title to the capital of the bank, or to the United States bonds or other securities or property in which the corporation invests its capital or funds. (*Regina* v. *Arnaud*, 9 Adolph. & Ellis, N. S., 806.)

(4.) The shares of stock are property distinct from the capital or property of the corporation, which entitle the owner of them to a portion of the gains and profits which the corporation may make and from time to time divide, and, on its dissolution, to a proportion of the proceeds of its property, after the payment of its debts.

(5.) The owner of the shares of stock has no interest in the capital of or property owned by the corporation, different in character from that which the owner of the notes or bonds issued by the corporation has. His interest is subordinate to that of the note or bondholder.

(6.) The tax, therefore, upon the citizen on account of these shares of stock — on account of the money which he paid for them, and which he at will may sell them for, is in no just or legal sense a tax upon the corporation, or its business or property. As justly, in a legal sense, might the owner of the circulating notes issued by one of these banks insist that they were not a part of his personal estate to be taxed.

4. It is believed that it was never seriously claimed that the owners of stock in the former Bank of the United States were exempt from taxation on account of the same. That was more exclusively an instrument or agency of the government than the present institutions. There is no decision or dictum favoring such a claim. The cases holding that the corporation, its business and property, were exempt from taxation by the States — that the States had no power to destroy it or impede its operations by taxation or otherwise — hold expressly or assume that the owners of stock were liable to taxation on account of the same under State authority. (*McCullough* v. *Maryland*, 4 Wheat., 316 ; *Osborn* v. *U. S. Bank*, 9 id., 738 ; *License Cases*, 5 How., 576, per TANEY, Ch. J.; *Bulow* v. *The Council of Charleston*, 1 Nott and McCord, 527 ; *State* v. *Collector*, 2 Bailey, 754.)

5. If the defendants are exempt, it is not perceived why an individual would not be exempt from taxation by the State

on account of the personal property invested in a line of stages employed in carrying the United States mails, or why the owners of stock in the Pacific Railroad Company, or other similar corporations created by congress, are not exempt from taxation by State authority on account of the same. These suggestions prove that the rule laid down by Ch. J. MARSHALL in the McCullough case, as to the liability of share-holders in corporations of the kind, is the proper rule.

III. The act of congress authorizing and creating these corporations, subjects the owners of shares of the stock to be issued by them to taxation on account of the same under State authority. The language of the act is: " Provided that nothing in this act shall be construed to prevent all the shares in any of said associations, held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation, in the assessment of taxes imposed by or under State authority, at the place where the bank is located, and not elsewhere." (Act of June 3, 1864, §§ 41, 62, found in Laws of 1863–4, p. 111.)

1. It is the obvious intent of the act of congress to subject the shares of stock to taxation by State authority. (See §§ 40 and 41 of the Act of Congress.)

2. This was the intention of congress in inserting this provision, as manifested by both houses in acting upon it and the bill. (Cong. Globe of 1863–4, part 2, pp. 1871, 1872, remarks of Messrs. Fessenden, Chandler, Pomeroy; id., p. 1890, remarks of Mr. Collamer; id., part 3, p. 2639, remarks of Messrs. Noble, Hooper and Ganson.)

3. Substantive affirmative provisions are frequently in the laws enacted by congress inserted in the form of provisos. The act in question contains several. (See §§ 7 and 16.)

4. The banking act authorizes the creation of these corporations, and authorizes them to receive from individuals money for shares of stock, and authorizes the latter to invest their money in these shares of stock. This money was subject to taxation before it was thus invested; but for this act of congress it would remain subject to taxation. If exempt now, it is by virtue of the act of congress; because

the act has created institutions in the stock of which it is invested. When, therefore, the act declares that it shall not be construed to exempt the shares of stock from taxation, it is equivalent to an affirmative enactment that the money which was taxable shall remain taxable when converted into the stock — a species of property created by the act of congress.

IV. Congress has power to subject these shares of stock to taxation by the States, like other personal property.

1. The exemption is by virtue of an implied prohibition by the Constitution in favor of the federal government — a prohibition for the benefit of the federal government. If congress deem it for the interest of the federal government, that these shares of stock should be subject to State taxation, it has power to waive the exemption.

2. When, in the act authorizing the creation of this kind of property — authorizing the investment of a large amount of the property, which previously was subject to taxation for State purposes, in these shares — it is declared that they shall be subject to taxation, the owners of them cannot successfully object that the State is violating an implied prohibition in favor of the federal government in taxing them.

3. That it is important to the successful working of the system of banking, inaugurated by this law, that the large amount of money invested by individuals in the shares of stock, should not be withdrawn from paying its share of State burdens, is believed to be obvious. Congress so believed. The law would be most likely soon repealed, if the persons owning the shares were exempt.

V. There is no breach of faith by congress in subjecting the shares of stock to taxation, although the whole amount of the capital of the bank was required to be, and in fact was, invested in the United States securities, which, when purchased by the bank, were exempt from State taxation.

1. This is so for the reasons stated in the second and subsequent subdivisions of point II, above.

2. The bonds were not, before they were authorized to be made the basis of banking, exempt from such burdens as

congress might see fit to impose upon their owners. They were merely exempt from State taxation for the benefit of the federal government.

3. When congress authorized these bonds to be made the basis of banking, authorized the owners to issue notes to circulate as money upon a pledge of them, they granted to the owners a privilege at their option, and had a perfect right to subject them, when used for this purpose, to State taxation.

The present provision in § 41, was reported by the senate finance committee in the place of a provision which contained this clause: "Provided, that no State tax shall be imposed on any part of the capital stock of such associations invested in the bonds of the United States, deposited as security for its circulation." On the amendment reported by the committee, there was a long discussion on the point, whether any portion of the shares should be exempted from State taxation, by reason of any United States bonds the bank might hold, and on every vote the expression was very strong against the exemption.

Senator FESSENDEN and Judge COLLAMER both forcibly argued that the shares should be made taxable, without reference to the amount of United States bonds the bank held, and more than two-thirds of the senate agreed with them. FESSENDEN said (Cong. Globe, p. 1872): "We do not break faith at all; because when we proposed to exempt certain bonds, issued by the government and purchased by individuals, from State taxation, it was simply as property so much invested, not as property used for the purpose of banking, giving to it another and distinctive character. We say simply, in reference to this matter, 'If you choose, instead of specie or any other property that you have, which is to be deposited as security for your bills, you may deposit, and we will accept, bonds of the United States.' That is a privilege we give them. Then we say, when there is an organization of a bank in this way, and the persons who put their capital into it take it out of their other business, or their other means, subject as that is to State taxation, and put it in this particular bank, that that capital shall remain subject to State

taxation precisely in the same way that other property is, or that it was before they invested it in that particular mode. This is all we say with reference to it. The question as to taxing these banks out of existence which has been talked about, has not the slightest application in the world; because we limit the power of State taxation. They must tax this property thus invested, precisely as they tax other personal property, and to no greater extent. The power of taxation is limited in the same way."

Judge COLLAMER said (p. 1890), "I insist that a tax upon the shareholders in a bank is no tax upon the stock of that bank. * * * But to say that a tax upon the share of a bank is a tax on the bonds that constitute the capital of that bank, is utterly fallacious. * * * * The truth is, that when we gave out these bonds to the people, all the assurance given to them was that they should not be taxed by the States. A man may have them and hold them, and I grant that they are property in one respect. For instance: they are the means of making a pledge; they can be used as collateral security for borrowing money. They are valuable in other ways, besides the interest received from the Government. But when you undertake to make a law by which you transfer them into banking capital, and enable the man who holds them, not to borrow money upon them, but to lend money upon them, that is entirely a different affiair; that is entirely a new privilege, and one to which, when granted, the government may annex such conditions as it thinks proper."

At page 2199, Judge COLLAMER further says, "But when we undertake to make them (United States bonds) into bank capital, and authorize the associations to issue currency upon the strength of them, and bank upon them, that is entirely a new privilege. That is the privilege of loaning money on them, not borrowing money on them; and for that new privilege of using these bonds as a banking capital, the government has a right of course to annex to the grant of that new privilege such conditions as it may think proper, and it has annexed a great many conditions in this bill."

VI. All the defendants were liable to taxation for and on account of their shares of stock in the first ward of Utica, where the bank was located; and the court below erred in giving judgment in favor of the four defendants who did not reside in the ward.

1. The attempt on the part of the defendants to avoid their share of the burdens, the benefits of which they and their property enjoy, on a technical ground, is not entitled to favor; and a liberal construction will be put upon the statutes, with a view to give effect to the legislative intent.

2. Congress had power to declare where the shares of the stock of its creature should be assessed and taxed, and it has done so. They are to be taxed " at the place where the bank is located, and not elsewhere." (§ 41 of Banking Act.)

3. As congress has the supreme power over this subject, the act of congress qualifies the State law requiring personal property to be taxed in the town or ward where the owner in fact resides; and they are to be read and construed together — the State law yielding to the paramount law.

4. It is the declared intention both of the State and national legislature that this property shall be taxed. (Act of Congress, § 41; 1 R. S., 5th ed., 905, § 1; Laws of 1855, ch. 37; *People* v. *Commissioners of Taxes*, 23 N. Y., 224.)

5. The provision of the State law as to the place where the property in question is to be taxed, is controlled by the act of congress. (1 R. S., 5th ed., 908, §§ 1 and 5; Act of Congress, § 41.)

6. Taxable inhabitants or residents in a town or ward will be construed to mean all those persons who, by law, are liable to taxation in that town or ward. (*People* v. *Utica Insurance Co.*, 15 Johns., 381, 382; *Ontario Bank* v. *Bunnell*, 10 Wend., 186; *British Life Insurance Co.* v. *Tax Commissioners*, 28 How., 41.)

7. But, again, the State law provides "That the assessors, in the execution of their duties, shall use the forms and pursue the instructions which shall from time to time be transmitted to them by the comptroller." In the present case they did so; the assessment of the defendants was, therefore,

in accordance with the State law. (1 R. S., 5th ed., 913, § 27.)

The State legislature has now expressly declared the State law to be in accordance with the act of congress and the instructions of the comptroller. (Laws of 1865, 172, § 10.)

VII. There is no lack of machinery to enforce the collection of the tax, the assessment being valid.

1. The tax to be recovered in a suit, and judgment enforced in the ordinary way, by execution and supplementary proceeding. (Laws of 1862, ch. 18, § 63.)

2. The tax imposed upon residents of the ward where the bank is located, may be collected in the ordinary way.

3. As to the non-residents of the State, the act of 1855 provides that the "taxes shall be collected from the property of the firms, persons or associations to which they severally belong." (Laws of 1855, ch. 37; 1 R. S., 5th ed., 905, § 2.)

4. As to the non-residents of the ward, but residents of the county, it is provided that the collector may "levy and collect the tax of the goods and chattels of the person assessed, in any ward within the said cities, or in any town within the said county" in which such person shall reside. (1 R. L., 5th ed., 919, § 10; 398.)

5. As to all or any who are assessed for a sum exceeding one thousand dollars, and who shall refuse or neglect to pay any tax imposed on him for personal property, and there is no property of which the tax may be levied, the assessor "may, in his discretion, make application within one year to the County Court, or Supreme Court, to enforce the payment of such tax," out of any debts, choses in action, or other personal property upon which levy cannot be made. (1 R. S., 5th ed., 919, § 11.)

6. Whenever any State or county tax cannot be collected, by reason of the removal of the person so assessed to any other county, the treasurer may issue a warrant to any constable or sheriff of the county where such person resides, to collect, &c. (1 R. S., 5th ed., 921, § 21.)

7. The neglect or refusal to pay such tax, according to law, shall be held and deemed to be a neglect or violation of

duty, or misconduct, within the provisions of title 13, ch. 8, part 3d, of R. S., and court may enforce payment by fine and imprisonment. (1 R. S., 5th ed., 919, § 12.)

VIII. The judgment against the defendant should be affirmed, and the judgment in favor of the other defendants reversed, and judgment rendered against them.

*A. C. Miller*, for shareholders.

I. The case cannot be distinguished, upon principle, from the cases which have passed upon review the judgment of the court of last resort.

The case of McCullough occurred in 1819. The State of Maryland placed a stamp tax upon the notes of the Branch Bank of the United States, located in Baltimore; and it was held that the bank was a means employed by the federal government for fiscal purposes, and if the right to impose such a tax were once admitted, the State could tax the bank to such an extent that it could not issue any notes whatever; that it was a tax upon the power of congress to borrow money, and was repugnant to the federal constitution, and therefore void.

The case of Osborn occurred in 1824. The State of Ohio imposed an annual tax of $50,000 upon the United States Bank, for each office of deposit and discount within the State. And the tax was held to be illegal, upon the same reasoning and principle of the Maryland case.

The case of Weston occurred in 1829. The city of Charleston passed an ordinance to raise supplies for the use of the city. The ordinance imposed a tax upon "all personal estate, consisting of bonds, notes, insurance stock, six and seven per cent stock of the United States," &c. A prohibition was issued to prevent the collection of the tax, and it was sustained by the court; and the proposition in its broadest sense was established, that the taxing power of a State does not extend to stocks issued by the federal government.

The case of the Bank of Commerce was before the same court in December, 1853. The bank was organized under the general banking act of New York, and had a large por-

tion of its capital invested in United States stocks; and it was held that the bank was entitled to a deduction upon its assessed valuation to the amount of government stocks held by it; and that by constitutional provision, and not by mere act of congress. And the principles of the former cases were reaffirmed and asserted.

The case of *The People* v. *Commissioners, &c.*, was before the same court in January, 1865. The legislature of New York, by ch. 240, Laws 1863, provided, in substance, that banks shall be liable to taxation on a valuation equal to the amount of their capital stock paid in or secured to be paid in, deducting the value of real estate. Held, this tax was in substance a tax upon the property in which the capital of the bank was invested, and that, so far as the capital of the bank was invested in government securities, the act was unconstitutional.

II. We affirm that there is not a single reason given for the judgment of the court in the cases cited, but what may be urged with equal force by us in this case.

The federal Constitution declares that the Constitution itself, and the laws passed in pursuance of its provisions, shall be the supreme law of the land, and shall control all State legislation and the State Constitutions, which may be incompatible therewith. The laws of the United States, made in pursuance of the Constitution, are to be the supreme law of the land, anything in the laws of any State to the contrary notwithstanding.

Therefore, the material inquiry in this case is, whether the laws of New York imposing this tax, be consistent with the free operation of the laws of congress, and the full enjoyment of the privileges conferred by them. If they be not, then the State law is void; if they be, then it is valid.

If the States may tax these shares of stock, to what extent shall they tax them, and where shall they stop? It is universally admitted, that an unlimited power to tax, involves a power to destroy, because there is a point beyond which the stockholders of these banks cannot bear taxation. (See Opinion of the Court.)

If the States may tax the shares of these banks, they have no limit but their own discretion, and these banks must necessarily depend upon the discretion of the State governments for their existence; for you cannot have these banks for national purposes, without requiring them to possess certain capital stock, and which must, from the necessity of the case, be divided into shares among the various stockholders.

The object in levying this tax may be, and doubtless was, to raise a revenue to the city or the State. In the next case, the object may be to expel the bank from the State. But how is this object to be ascertained, or who is to judge of the motives of legislative action? If New York can suspend the operations of these banks, the same power can shut up the custom house, can impose a stamp tax on the judicial process of the federal courts, on permits, clearances, registers and all other documents connected with imposts and navigation. And what is to hinder her from imposing a tax upon the officers of internal revenue, the post-office and the like, until she may completely block the wheels of the general government within her borders. This tax is an attempt to raise a revenue for State purposes, by an imposition of taxes upon property and franchises holden under the authority of the general government, and created by that government for purposes connected with its own administration. There is not a single bank established under the authority of congress, that can exist, if this right to tax its stockholders exists in the State governments; and a surrender, on the part of the government to the States, of this right, would be a giving up of those fundamental and essential powers, without which the federal government cannot be maintained. Which we shall show, as we proceed with our argument, congress has no power to do.

A bank may not be, and is not absolutely essential to the existence and preservation of the government, but it is essential to the existence and preservation of the government that congress shall be able to exercise its constitutional powers at its own discretion, without being subject to the

control of State legislation. Congress having decided both the necessity and utility of establishing these banks, the State governments cannot interfere with that decision, or obstruct in the slightest degree the operation of its measures. To hold otherwise, would be to hold and declare that congress can only exercise its constitutional powers, subject to the controlling discretion of the State governments.

These banks, as ordained by congress, are instruments to carry into execution its powers. (See Opinion.) And in order to enable these instruments to operate effectually, they must be under the direction of the power that created them, and which is responsible to the country for their success. They cannot be interfered with or controlled in any manner by the States, without putting at hazard the accomplishment of the end of which they are but a means. But the asserted power to tax any of the institutions of the United States, presents directly the question of the supremacy of the national laws over State laws. If this power really exists in the States, its natural and direct tendency is to annihilate any power which belongs to congress, whether express or implied.

All the powers of the national government are to be executed in the States, and throughout the States; and if the State legislatures can tax the instruments, the means, the machine by which those powers are executed, they may entirely defeat the execution of the vital powers of the federal government. If they may tax an institution of finance, so they may in like manner tax any other of the national institutions. If the State may tax these stockholders to one degree, they may tax them to any degree. The right once admitted, and they may tax the bank out of the State. Here a tax is imposed upon a species of property, between which and the taking power there is no political connection.

It is argued that this is a question of great importance to the people of this State, so far as the same relates to the maintenance of the State government; but that consideration sinks into insignificance when compared with the vital

importance to the Union that it should not be subject to the dictation or discretion of State legislation, as to the manner in which the federal government shall execute the powers essential to its very existence. And especially so at this time, when every muscle of the nation is exerted to its utmost to supply ways and means for the support of our government and maintenance of its credit.

There is no express provision in the Constitution which exempts any of the national institutions or property from State taxation. It is only by implication that the army and navy and treasure of the Union are exempt from State taxation. Yet they are practically exempt, and must be, or it would be in the power of any one State to destroy their use. Is there any doubt at this day of the power of congress to establish these banks? The right is and must be admitted; and it is self-evident that what the United States have the right to do, no individual State has the right to undo; and the power to establish carries with it the power to continue and preserve. It cannot require argument to show that there is a manifest antagonism between the power to lay this tax, and the power of congress to establish and preserve these banks. The State discretion cannot be controlled by the national councils, or the action of the courts. Whenever the State wills it, all the national banks established within her limits must be expelled from the State; and if one national institution can be destroyed in this manner, all can be destroyed in the same manner.

You have but to look at the acts passed at the last session of our State legislature, to see the commencement of State interference with these institutions. At the time this assessment was made, the statute was express that every person should be assessed for his personal property in the town or ward in which he resides. And this court had held (1 Kern., 563, 15 N. Y., 316), that an assessment made against a person, for personal property, in a town or ward other than that in which he resided, was illegal. Yet after this action had been submitted at the General Term, and while it was there pending and undecided, and after the county tax for 1864

had been levied, and the warrant in the hands of the collector, the legislature passed, on the 27th of March, an act ratifying and confirming this very assessment, with a proviso that it should not affect this action. (Laws 1865, p. 350.) Thus the legislature did not hesitate to pass a retrospective statute, as to all stockholders not parties to this action, in direct violation of all principles of just and sound legislation. Yea, they did more, — they singled out the stockholders of this particular bank, to confirm an admitted illegal assessment; leaving the stockholders of other banks in the State, who were in a like situation, to go free from taxation.

The stockholders of the First National Bank, located in the same ward with the Second National, were not assessed to the extent of one dollar; and the same was the case with the national banks in the city of New York, and many other places in the State. It is but fair to presume that there were other illegal assessments in the State as to other species of property and persons. Yet no act to confirm was passed.

By the 11th section of the enabling act (Laws 1865, p. 173), it is provided that national banks shall retain so much of the dividends belonging to any stockholder as shall be necessary to pay the taxes assessed upon the stockholder as such. Here is a direct and positive interference with the management and conduct of these banks. And yet, if these banks, and their stockholders as such, are within the sovereign jurisdiction of the State, such statute may be upheld and enforced. And if the State may control the conduct of these banks to this extent, by legislation, where does the State jurisdiction end? What measure may the State not adopt for the control and management of these institutions? The right of legislation once admitted, and there is no power to control or limit it. And there will be no end to the constant and interminable interference by State legislation, and among the various States there can be no such thing as a uniform system of banking throughout the country.

There is an absolute necessity of repressing such attempts in their infancy. A power to impose this tax carries with it a power to impress other taxes without limit, and is in effect a

power to repeal the law of congress by which these banks are organized. These banks are as much institutions of the sovereign power of the Union as the custom house. All the national property and institutions are constructively without the local territorial jurisdiction of the individual States, in every respect and for every purpose, including that of taxation. If congress has a power to do a particular act, no State can impede, retard or burden it. Can there be a stronger ground to infer a cession of State jurisdiction?

The certificates and bonds of the public debt, issued under the power of congress to borrow money, and which are the basis of this bank, are means and instruments whereby congress exercises that power under the Constitution. The money lent, while in the hands of the lender, is clearly subject to the sovereign power of taxation in the States; but the instant that it passes into the hands of the federal government, it (*i. e.* the money) is free from State taxation in any form. It is then withdrawn from the State power of taxation, and the lender has received, in lieu of his money, a certificate for its repayment; which certificate is distinctly held to be as much a means for executing the power of congress to borrow money, as are revenue cutters for enforcing the power of congress to lay imposts and duties, and is exempt from the sovereign power of State taxation. But now it is attempted to bring the money lent back under the sovereign power of the State, by taxing the creditor's title to its repayment; which title is distinctly a means whereby the United States procure the use of the money they obtain on the public credit. These banks and their stockholders, as to their shares of stock, are not residents within the sovereign jurisdiction of the State of New York, that is to say, the sovereign power of the State does not extend to them for any purpose. And the State of New York might as well undertake to tax a national bank, or its stockholders, located within the sovereign jurisdiction of California, as one located within her own borders. The sovereignty of the State does not extend to them for any purpose whatever. But they are properly subject to the sovereign jurisdiction of the federal

government alone, which is supreme to the sovereignty of the States.

It is clear that if, the power to tax these shares of stock resides in the State government, the State may select them as the special object of taxation, at its own discretion, for the State is not hampered with any provision of the federal or State Constitutions to prevent it. The implied power to tax involves the power to discriminate between the subjects of taxation. If a discretion exists, the courts cannot determine whether it is wisely or unwisely exercised. If the legislature has the power to deliberate and decide, the conclusion which it reaches is wholly beyond the scope of judicial or congressional action.

No exception to State taxation is claimed by express provision of the Constitution. It arises under the general nature of the government, and from the principle of the supremacy of the national powers and the laws made to execute them, over the State authorities and State laws.

These national banks, and the shares of stock held by the stockholders, which are but component parts of the bank itself, are as much the instruments of the federal government for fiscal purposes, as the courts are its instruments for judicial purposes. Ch. J. MARSHALL, in delivering the opinion of the court, says that "The means employed by the United States government were given by the people of all the States, and that, therefore, the people of a single State could not confer a sovereignty which will extend over them;" and the Baltimore case expressly decided that a note of the United States Bank was one of the modes, or means employed by the federal government, to execute its power to borrow money upon the public credit. But the circulating notes of the United States Bank were no more a means for the purpose mentioned, than are the shares of stock in national banks. A tax upon the shares of stock against the individual stockholders, results the same as a tax upon the capital stock of the bank against the bank itself; and as much impairs the efficiency of the instrument, as a tax upon the bank as such. And is a direct, positive, and may be effectual impediment to

the free exercise of congress, of those powers so vitally necessary to the preservation of the Union.

This tax is a tax upon property. It is not a tax upon the mere scrip of the stockholders, but it is a tax upon the stock itself. Now we would inquire, what is the property which is thus taxed? The capital of the bank is entirely invested in government securities. It owns no other property; and therefore the property of the individual stockholder which is taxed, is simply his interest in the government securities, comprising the sum total of the capital of the bank. The incorporators of national banks are required to state in their certificate of incorporation the amount of capital stock, and the number of shares into which the same shall be divided. (§ 6 of National Banking Act.) Now, it will be admitted, that a tax against the bank upon its capital, in its aggregate form, would be unconstitutional, because it would impede the power of congress to borrow money; and yet it is argued that a tax upon the same capital, in another form, *i. e.*, when divided among the stockholders, is legal, notwithstanding it has precisely the same result of impeding the power of congress, as a tax against the bank itself. It can make no possible difference upon principle, or in the ulterior results upon the power of congress to borrow money, whether the tax is imposed upon the bank directly, or upon the individual stockholders; the abuse is the same in both instances. If it was an impediment to the power of congress to borrow money, for the State of Maryland to impose a stamp tax upon the circulating notes of the United States Branch Bank, because the United States Bank was a means employed to execute the powers of congress to borrow money upon the public credit, it is for the same reason an impediment to allow the States to impose a tax upon these shares of stock in this bank. The circulating notes were not indispensable to the existence of the United States Bank. The bank could have done business and existed without them; but here these shares of stock are indispensable to this bank. No bank can be organized by a single individual under the statute. It requires at least five persons to form one of these associa-

tions, and their interests must be kept in the form of shares of the capital stock.

It cannot be denied that the power to tax, once admitted, is unlimited, and we affirm that a State law, which imposes a tax upon any of the national institutions, is clearly repugnant to the law establishing such institutions; and Ch. J. MARSHALL lays it down as a rule, that " A law absolutely repugnant to another, as entirely repeals that other, as if express terms of repeal were used." (4 Wheat., 428.)

It is submitted that the case rests upon the principles laid down by Justice MARSHALL, in the Baltimore case. He says:

" All subjects over which the sovereign power of a State extends, are objects of taxation, but those over which it does not extend, are, upon the soundest principles, exempt from taxation." " The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission, but does it extend to those means which are employed by congress, to carry into execution powers conferred on that body by the people of the United States? We think it does not. Those powers are not given by the people of a single State; they are given by the people of the United States, to a government whose laws, made in pursuance of the Constitution, are declared to be supreme. Consequently, the people of a single State cannot confer a sovereignty which will extend over them."

" If we measure the power of taxation residing in a State, by the extent of sovereignty which the people of a single State possess and can confer on its government, we have an intelligible standard applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a State unimpaired; which leaves to a State the command of all its resources; and which places beyond its reach, all those powers which are conferred by the people of the United States on the government of the Union, and all those means which are given for the purpose of carrying those powers into execution. We have a principle which is safe for the States and

safe for the Union. We are relieved, as we ought to be, from clashing sovereignty, from interfering powers, from a repugnancy between a right in one government to pull down what there is an acknowledged right in another to build up, from the incompatibility of a right in one government to destroy what there is a right in another to preserve. We are not driven to the perplexing inquiry so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power. The attempt to use it on the means employed by the government of the Union, in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give."

State sovereignty is supreme power, and it is clear that the sovereignty of the State in no manner extends over the property included in this tax. These banks do not hold the grants of their franchise by State authority. Nor are they introduced by State permission. From no State law, power or functionary, do they "*borrow leave to be*," nor can they be excluded by any such power operating directly upon them, or indirectly through taxation. No law of the State can add to or take from them powers or rights, and no act of the legislature can affect them one way or the other, and especially to their injury as instruments of the federal government.

It cannot be denied that these national banks are authorized by the federal government, as one of its fiscal means in sustaining the operations of the government. It has long been considered by many that it was the constitutional duty of the government to regulate the currency of the country. All other constitutional governments assume it as a prime necessity that they should establish a sound and uniform currency. The constitution grants congress the exclusive right to "*coin money, and regulate the value thereof*," and forbids the States from emitting bills of credit, and making anything but gold and silver a legal tender. Some have claimed that these terms prevent the organization or chartering of State banks. That in consequence of congress failing to exercise

the powers thus conferred, we have never had a uniform or sound currency, and that the evils resulting, have been of great detriment to the country at large.   Whether this be so or not, one thing is certain, that the financial necessities of the government, consequent upon a state of war, have obliged the issue of vast amounts of government bonds, the credit of which must be sustained.   The government was compelled to establish a banking system of its own, and one which has thus far worked much benefit, both to the government and the people at large; and we are confident that this court will not feel disposed to pronounce a judgment, the effect of which will inevitably destroy the entire system in its infancy, unless the law of the land sternly demands it.

The right of taxation is an incident of sovereignty, and the right of legislation is coëxtensive with the incident, to attach it upon all property within the jurisdiction of a State. But in our system of government there are of necessity limitations upon that right.   There is a concurrent right of legislation in the States, and in the United States, except as both are restrained by the Constitution of the United States.   Section 8 of the 1st article of the Constitution has seventeen subdivisions, each one of which contains a grant of one or more powers to congress, all of which are to be exclusively exercised by it; except by the 10th section of the same article, congress may give permission to the States to levy imposts, or duty on imports, or tonnage; to keep troops and ships of war in time of peace; to enter into an agreement or compact with another State or foreign power; and to engage in war; but without such express permission of congress the States have no authority to interfere with any of the powers granted to congress.   Among these powers exclusively vested in congress is the power to "borrow money upon the credit of the United States," and the States are restrained by such prohibitions as are necessarily implied when the exercise of a right by the States conflicts with the free and perfect execution of another sovereign power delegated to the United States.   That conflict occurs when taxation by a State acts upon the instruments or means or persons which the general

government may use or employ as a necessary or proper mode of executing its sovereign powers.

Applying these principles to the question presented to the U. S. Supreme Court, in *Dobbins* v. *The Commissioners of Erie Co.* (16 Peters, 435), where a statute of Pennsylvania provided that an account should be taken of "*all offices and posts of profit,*" and making it the duty of assessors "*to rate all offices and posts of profit, professions, trades and occupations at their discretion, having a due regard to the profits arising therefrom,*" it was held that a captain of a revenue cutter of the United States, on Lake Erie, was not liable for taxes under the law, such officer being rated and assessed for his office at $500.00 per year. It was argued that it was the emoluments of the office, and not the office, that was taxed; but whether it be one or the other the tax was equally void. The act should have restricted the assessments to offices and posts of profit held under the sovereignty of the State, and not have included offices and posts of profit of another sovereignty — the United States.

Justice WAYNE, in delivering the opinion of the court, says: "Is not compensation (to the officer) the means by which his services are procured and retained? *It is true it becomes his when he has earned it. If it can be taxed by a State as compensation,* will not congress have to graduate its amount with reference to its reduction by the tax? Can congress use an uncontrolled discretion in fixing the amount of *compensation,* as it would do without the interference of such a tax? The execution of a national power, by way of *compensation* to officers, can in no way be subordinate to the action of the State legislature upon the same subject. It would destroy all uniformity of *compensation* for the same service, as the taxes by the States would be different. To allow such a right of taxation to be in the States, would also, in effect, be to give to the States a revenue out of the revenue of the United States, *to which they are not constitutionally entitled, either directly or indirectly, neither by their own action nor by that of Congress.*" Concede, for the moment, that there is a distinction between a tax upon the

capital of the bank and a tax upon the shares of stock, which we shall show " is a distinction without a difference" before we close our argument, yet how perfectly the reasoning and the language of the court applies to the case now under consideration. In the very language of the court, is not the compensation which those stockholders receive, the means by which the use of their money is procured and retained ? It is true it becomes theirs when it is earned, but if it can be taxed by the State in any form, either by a tax upon the capital stock or its shares or dividends, will not congress, in order to procure the use of the means thus sought, have to graduate the amount of compensation which it offers, with reference to its reduction by this tax ? Could congress use an uncontrolled discretion in fixing the amount of compensation, as it could do without the interference of such a tax ? The execution of a national power by way of compensation to persons who afford the means to congress to execute its powers, to give life and sustenance to the government, can in no way be subordinate to the action of the State legislatures upon the same subject. It would destroy all uniformity of compensation. " It would, in effect, give to the States a revenue out of the revenue of the United States, *to which they are not constitutionally entitled, either directly or indirectly, neither by their own action nor by that of congress.*"

If a tax upon the income of an officer of the United States, received as compensation for his services, would be unconstitutional, simply because the government might be obliged to graduate his compensation with reference to the tax, then it is clear that a State tax (whatever may be its form) which may have the effect of obliging congress to increase its rate of interest upon the public debt, or taking upon itself burdens beyond what it would not otherwise be obliged to do, is equally unconstitutional. The State of Maryland, in 1821, passed an act requiring all importers, and others selling imported goods by wholesale, to take out a license, for which they were to pay $50, and in the case of *Brown* v. *The State of Maryland* (12 Wheat., 419), the act was held unconstitutional, and Chief Justice MARSHALL, in delivering the opinion

of the court, says (p. 439): "It is obvious that the same power which imposes a light duty can impose a very heavy one, one which amounts to a prohibition. Questions of power do not depend upon the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed." If the tax may be levied in this form by a State, it may be levied to an extent which will defeat the revenue of the government so far as it is drawn from this banking system.

But it is argued by the court below, that a supposed and merely possible inconvenience, which might arise from an improper use of State power, furnishes no ground for holding against the existence of the power; that we must be continually liable to this inconvenience from the complex nature of our government. "That there is scarcely a power vested in the States, which may not in some way and at some time be wielded against the general government. The States may, in exercising the taxing power, take from the citizen all or so much of his property, as to disable him from paying taxes assessed by the federal government." These arguments are fully discussed by Justice Marshall, in the case of 12 Wheat. At page 440, he says: "These arguments apply with precisely the same force against the whole prohibition. It might, with the same reason, be said that no State would be so blind to its own interests as to lay duties on importation which would either prohibit or diminish its trade. Yet the framers of our Constitution have thought this a power which no State ought to exercise." But conceding that it is not a mere possibility of inconvenience in the exercise of powers, that creates the prohibition, yet an immediate and constitutional repugnancy, that can by application, alienate and extinguish a preëxisting right of sovereignty, is a violation of the Constitution. (Federalist, No. 32.) And such is conceded by the court below to be this case. If the State has this uncontrolled constitutional right of taxation, without any affirmative act of congress permitting it, then it may enact that the stockholders of national banks shall pay all of the taxes of the State, and thus deny to the stockholders

of these banks the right of using the franchise, which they
have purchased of the United States, until they have also
purchased it from the State. What do the stockholders of
these banks obtain by the purchase of their franchise of the
general government, if they do not purchase the right to use
it without State interference?

The distinction taken that this is not a tax on the bank, nor
is it, *eo nomine*, on stocks of any kind, but is upon the per-
son of the stockholder for stock held by him, can have no
influence on this part of the case; for it is too obvious for
controversy that both equally interfere with the power of
congress. This precise question was up in the case of *Brown*
v. *The State of Maryland* (*supra*), where the tax was placed
upon the person of the importer, not upon the goods imported;
and it was argued that you could not abridge the acknow-
ledged power of a State to tax its own citizens, or their
property, within its territory. But Chief Justice MARSHALL,
in reply, says: "We admit this power to be sacred; but
cannot admit that it may be used so as to obstruct the free
course of a power given to congress. We cannot admit that
it may be used so as to obstruct or defeat the power to regu-
late commerce. It has been observed that the powers
remaining with the States may be so used as to come in
conflict with those vested in congress. When this happens,
that which is not supreme must yield to that which is
supreme." "It results from this principle, that the taxing
power of the States must have some limits. It cannot
reach and restrain the action of the national government
within its proper sphere. It cannot reach the admin-
istration of justice in the courts of the United States,
*or restrain the operation of any law which congress may
constitutionally pass.* If the States may tax all persons
and property found on their territory, what shall restrain
them from taxing goods in their transit from one port to
another for reëxportation." This attempt to distinguish
between a tax against the bank upon its capital and a tax
against the shareholders upon their shares of capital, or a
tax upon the use made of government securities, is but varying

the form, without varying the substance. It is impossible to conceal from ourselves the fact that the injury to be avoided by the prohibition is the same, whether it be the one or the other. This attempted distinction is treating the prohibition, which is general, as if it were confined to a particular form or mode of doing the forbidden thing. (12 Wheat., 444.)

The prohibition claimed is not special or limited. There is no express prohibition against taxing national securities or national banks, but the prohibition is general against allowing the States to do anything that will impede the exercise of the powers granted to the general government. No matter what may be the power claimed by the States, whether it be a tax on national securities, a tax on imports, or a tax upon these shares of stock, if the result upon the powers of congress is the same, the same prohibition in the one case must apply to the other. (12 Wheat., 444.)

Justice NELSON, in the last case before the Supreme Court (*State of N. Y.* v. *Commissioners, &c.,* 4 Am. L. R., 279), says: "Where the capital of the banks is required or authorized by law to be invested in stocks, and among others in United States stocks, under their charters, or articles of association, and this capital thus invested is made the basis of taxation of the institution, there is great difficulty in saying that it is not the stock thus constituting the corpus or body of the capital that is taxed. It is not easy to separate the property in which the capital is invested from the capital itself. It requires some refinement to separate the two thus intimately blended together. The capital is not an ideal, fictitious, arbitrary sum of money set down in the articles of association, but in the theory and practical operation of the system is composed of substantial property which gives value and solidity to the stock of the institution. It is the foundation of its credit in the business community." The legislature had, by ch. 240, Laws 1863, provided, in substance, that State banks should be liable to taxation on a valuation equal to the amount of their capital stock paid in or secured to be paid in, and it was urged that the capital of the bank was not taxed at all, that the tax was in the nature of a

royalty for their franchise, and not a burden on the property itself, that the State had the constitutional right to say that the banks of the State should pay all the taxes of the State in their discretion; but it was held that so far as the banks held securities of the United States, the act was unconstitutional, which we submit is going much further than we ask the court to go in this case.

Justice MULLIN cites the case of *Bulow* v. *The City of Charleston* (1 Nott & McCord, 527), where it was held that the stock of the Bank of the United States, in the hands of individuals, may constitutionally be taxed by the States. Also the case of *State* v. *Collector* (2 Bailey, 754), where it was held that an act of the State of South Carolina, imposing a tax of one per cent on all dividends of banks not chartered by the State, was valid.

The former occurred in 1819, the latter in 1830, and both of which cases are distinctly overruled by the principles of subsequent cases, in the Supreme Court of the United States. Upon the argument, below, some stress was laid on the *dictum* of Ch. J. MARSHALL, in the case of McCullough, at the close of his opinion. Upon examination it will be found that he did not intend to pass upon the question as to whether a State tax upon "the stock of the United States Bank," in the hands of a stockholder, was valid or not.

III. The courts have always held that congress might pass a law exempting government securities from State taxation, and such a law was passed by congress on the 25th of February, 1862.

The 2d section, in terms, declares that "all stocks, bonds, and other securities of the United States, held by individuals, corporations or associations, within the United States, shall be exempt from taxation by or under State authority."

It was under that act that $166,000 of the stocks composing the capital of this bank were issued, but the exemption also extends to all stocks of the United States, and applies to the 10-40 bonds equally with the 5-20 bonds. Indeed, the act of March 3, 1864, under which the 10-40 bonds were issued, also expressly declares that "all bonds issued under

this act, shall be exempt from taxation, by or under State or municipal authority," and no act of congress will be found in any manner changing the exemption thus given.

Now, it is clear that if these bonds were held by individuals, they would not be the proper subject of State taxation. (*Weston* v. *The City of Charleston*.) It is equally clear, that a tax on the bank would be void. (*McCullough* v. *Maryland*.) So, too, a tax upon the capital stock of the bank has been held to be a violation of the Constitution. (*The Bank of Commerce* v. *Commissioners of Taxes, &c.*) In what respect is the principle changed, when a number of individuals, instead of retaining their bonds in their own custody, deposit them, under the authority of congress, with an officer of the government, appointed for that purpose, and receive from the common agents, who make the deposit, a certificate or a paper simply containing the evidence as to the amount of the individual interests in the common deposit? A party holds five thousand dollars of government bonds; it is admitted that they are not within the sovereign jurisdiction of the State; he subscribes for stock in one of these banks, and pays in his bonds as a part of the capital. It is claimed he is now liable to be taxed. Will some one tell us, when and how the State obtained its sovereign right of taxation, which it now proposes to exercise? What act has been done by the holders of the bonds to confer this sovereignty? and how is it that the prohibition of the Constitution, so proper for the public safety, has ceased to operate?

What is the interest which these stockholders possess in the capital of this bank, and which is now attempted to be reached for taxation? We answer, it is an interest in the capital stock of the bank, and nothing else. And of what is the capital stock of the bank composed? We answer, government securities, which are declared by the Constitution of the United States, the supreme law of the land, to be exempt from State taxation; which are declared by the laws of congress, made in pursuance of the Constitution, and therefore supreme over any State law, to be exempt from

State taxation; and which are declared by the highest coi in the land, to be so exempt.

No State in the Union has a greater interest to maintain the integrity of the Constitution, to preserve throughout all our national institutions, and to hand down to posterity our Union, as we received it from our fathers, defended against the dogmas of State rights, as well as the attempts at ·destruction by open rebellion, than has the State of New York. The necessities of our government for money are urgent. To meet those necessities and maintain the public credit, requires that all the powers of the nation should be brought into active operation; that they should be in no manner obstructed by State action; that no surrender of those powers, so essential to national existence, should be made to the States by congress, without the plainest sanction of the Constitution. We believe the people of this State, however onerous may be their taxes, would be the last to enforce this tax, if in so doing it will in any manner conflict with the Constitution, by obstructing any of the means which the government may constitutionally employ to maintain the public credit.

There may be, and doubtless are, a class of men whose minds. never comprehend anything extending beyond self-interest, who will cry out against the injustice of allowing one to enjoy all the advantages of society, and protection of his property and rights, and live in affluence upon an income derived exclusively from interest on government stocks, exempted from taxation. But it should be remembered that these national banks and national stocks are the proper subjects of national taxation, and as soon as it becomes the policy of the nation to tax them for national purposes, beyond what they are already taxed, that policy will be enforced. But it is clear that the present policy of the nation is not to tax them beyond the present rate imposed by the laws of congress, and especially not to allow them to be taxed for State purposes.

These banks are now taxed by congress upon their circulation and deposits, besides a license tax. This is all the

taxation which congress, at present, in view of the governmental policy of making these institutions useful to the government and the people, have deemed it prudent and safe to impose, and any other or further burden should only be imposed by the same authority, and in furtherance of the same policy.

The foundation of the obligation to pay taxes is not, as some people suppose, the privileges enjoyed or the protection given to a citizen by the government. Like protection is due to all. Those members of a State who do not, because they are not able to, pay taxes, are entitled to the same privileges as the greatest tax payer in the country. (16 · Peters, 446.) Married women and children have privileges and protection, but they are not assessed unless they have property separate from the heads of the families. So, too, with clergymen and charitable institutions. It is the necessities of the government for money in times of peace or war, that fixes the obligation to pay such taxes as may be imposed by lawful authority.

IV. We come now to the consideration of the 41st section of the last banking act of congress, approved June 4th, 1864, under which, as we understand, the assessors acted in making this assessment. The language of the act is :

" Provided, that nothing in this act shall be construed to prevent all the shares in any of said associations, held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation, in the assessment of taxes, imposed by or under State authority, at the place where such bank is located, and not elsewhere."

Now we deny that this section grants any authority whatever to make this assessment.

It will be observed that the language is not that these shares " *shall be*," or " *may be*," included in the valuation of the tax payers' property. But the language is, " that nothing in this act shall be construed to prevent·" their being included, &c., and therefore the act leaves the right to tax or not to tax, the same as though the act had not been passed.

It is neither granted, prohibited or affected by the section, one way or the other, but leaves the right to tax or not to tax to the provisions of the Constitution and laws as they stood prior to the passage of the act in question. It was clearly the intention of congress, by the language used, neither to grant or restrict the general right of State taxation; but only, in the event that the States possessed the right to tax these shares under the Constitution and existing laws, and should exercise that right, then to provide that they should not show an unfriendly discrimination against national banks, in favor of State banks and other moneyed capital. It cannot be possible that congress, by using the language, "Provided, that nothing in this act shall be construed to prevent," &c., intended thereby to grant or impart to the States so important a power as taxing these national institutions. If any such intention prevailed, the language employed would have been express.

The intention of the legislature is to be searched for in the words of the statute. Courts cannot correct what they may deem excesses or omissions in legislation, without the danger of doing vastly more mischief than good. Where there is no ambiguity in the words, there is no room for construction. To determine that a case is within the intention of the statute, its words must authorize us to say so. When the intention, if entertained, is not expressed, it is the duty of the court to declare "*quod voluit non dixit,*" or when the words fall short of the intent, it is the duty of the court to give effect to the expressed sense or words of the law, in the order in which they are found in the act, according to their fair and ordinary import and understanding, for it must be remembered that courts are appointed to administer and not to make the law. (Sedgwick on Statutory Laws, 233, 243, 244; Broom's Maxims, 60; 3d ed., 91.)

There are no express words granting this power to the States contained in the statute, and the words "*Provided, that nothing in this act shall be construed to prevent,*" are the only words from which any such power can be implied or inferred. Were the same terms used in a deed between indi-

viduals, they could not be construed as granting any title or right beyond the express words of the deed.

It is submitted that one of the obligations of the contract upon which these bonds were issued, was that they should be exempt from State taxation, either directly or indirectly, by assessing the shares of these banks. And it is not to be presumed that congress would violate a sacred obligation of its contracts. Express language, leaving nothing to be presumed or implied, should be used to accomplish such a purpose.

V. But supposing that the terms of the statute were explicit and unequivocal, granting to the State power to tax these shares of stock, then the further question would remain, is it in the power of congress to impart such a power? Can congress relinquish to the States a sovereign power, which all the States have delegated to the federal government for the benefit of all? Can the legislative power of congress confer upon the States an authority which the States can execute to the utter annihilation of our national institutions? If congress may surrender to the States any such power in this instance, the same authority may surrender to the States any other or all of the sovereign powers granted by the States to the federal government. It has been held that the State power of taxation is a sovereign power within the scope to which it extends, and within this limit it admits of supervision or control. (*The People* v. *The City of Brooklyn,* 4 Comst., 422.) And if congress can allow the States to lay this tax upon one of the means employed to carry out the general powers granted to congress by the federal Constitution, it may in like manner authorize a State tax upon United States bonds, *eo nomine,* or a tax by the States upon the custom house, the post-office, the officers of internal revenue, or any of the means employed to carry on the government. If congress may surrender this right to the extent claimed, it may surrender it to any extent; until at last we find that the existence of our national government depends upon the will of congress. *It is* not the extent of the surrender, or the wisdom or policy of it in this particular instance, that we are

discussing, but we deny the right to surrender to any extent, or for any purpose; for such a right or principle once admitted, would be fraught with the most evil consequences to our national existence.

It will doubtless be argued that under the provisions of the 41st section, the States are prohibited from singling out these bank shares as especial objects of State taxation. The remark is true but to a limited extent, for the State may lawfully enact that the State and national banks and moneyed capital of the State, shall pay all the taxes of the State, and thus relieve real estate from taxation. A concurrent power in the States to tax national institutions would inevitably lead to conflict between State and national authority. Accordingly, it is the clearly established law of the federal Constitution, in order to avoid all such conflicts, that the powers of the States are not held to apply to the subjects embraced in the execution of the powers of the United States.

It is clear that the sovereign jurisdiction of this State does not extend to the State of Ohio, and that congress cannot confer any sovereign power to a State, over subjects within the sovereign jurisdiction of another power; but the sovereignty of the United States is as distinct from the sovereignty of New York, as are the two sovereignties of Ohio and New York. A national bank located in this State is subject to the sovereignty of the national government, and congress would have the same right to say to Ohio, you may tax national banks or their stockholders located in New York, as it would to grant the power claimed to be given by this statute. No, these national banks and their stockholders, as respects their stock, are as much without the territorial jurisdiction of this State, as the United States Bank was in the Maryland or Ohio case, as the United States bonds in the Charleston case, as the importer in the Maryland case, as the salary in the case of the master of the revenue cutter, and as the bank stock in the New York cases.

In the language of MARSHALL, Ch. J., "the means employed by the United States government were given by the people of all the States, and therefore, the people of a single State

could not confer a sovereignty which will extend over them.'
The same principle is an insurmountable objection to the
right of congress to confer upon or surrender to a single State
a sovereign power which has been voluntarily granted to
the federal government for the benefit of the people of all the
States. It will not do to say that the surrender is not con-
fined to a single State, but is universal as to all the States,
because, if congress possesses the power to impart such right
to all the States in its discretion, there is nothing in the Con-
stitution to prevent it from limiting its liberality to a single
State or combination of States to the entire exclusion of the
others; and no judicial tribunal would have the power of
reviewing such discretion. The State of New York holds a
much larger portion of government bonds for banking pur-
poses, than does any other State, and how is the State of
Georgia, which may and probably does hold but few or
none of these bonds for banking purposes, to share equally
with New York the benefits derived from this system, which
the people of one State are equally entitled with the people
of another?

We believe that our government is based upon a surer
foundation than the will of congress. Neither the executive,
congressional or judicial departments of our government, or
all combined, have any power under the Constitution to sur-
render to the States the least of the sovereign powers granted
to the federal government. Nothing short of an amend-
ment to the Constitution, properly enacted, can reinvest the
States with any of the sovereign powers delegated to the gen-
eral government. (16 Peters, 448.)

It is argued by Justice DANIELS, in *The People ex rel.* v.
*The Board of Education of the Village of Lockport* (MS.
opinion), that the tax is not imposed or assessed upon the
bonds, but it is the uses they are devoted to that is taxed.
That if additional advantages are sought for these bonds, by
making them available banking capital, the privilege of so
using them should be so far paid for to the public, as it may
be, by rendering the shares in the capital they create liable
to State taxation, which is the only benefit derived either

by the State or nation for the valuable franchise conferred by the national banking law upon these associations. It is submitted that there is no real distinction between a tax upon the use made of these bonds and a tax upon the bonds themselves. There is no difference in the practical operation of the two taxes. The attempted distinction is but a disguise thrown about the case to elude detection. The true test is to consider the effect upon the power granted to congress to borrow money for the support of the government. The objects committed by the Constitution to the general government are of immense magnitude and require corresponding means. Of all the modes of raising money for the maintenance of our government, that of borrowing money upon the public credit is the most ready, fruitful, least oppressive, and, we may add, is absolutely indispensable; and of all species of taxation, that which lays its hand in any manner upon this power of congress is the most hurtful and destructive to our government. It was sound policy, therefore, for the framers of the Constitution to cherish and protect this power, by proper prohibitions, against the States, because, whenever it fails, other modes of "ways and means" must necessarily be resorted to of a more odious and oppressive nature. A tax upon the importer, as such, is a tax upon importation; a tax upon the master of a revenue cutter, or upon his emoluments, is a tax upon the office; a tax upon the income of these bonds is a tax upon the bonds; and a tax upon the capital of a bank invested in government bonds is a tax upon the bonds, and nothing can be clearer than that a tax on the use of an article is a tax on the article itself.

But Justice DANIELS says that the privilege of using these bonds for banking purposes should be paid for to the people of the State, as though the people of this State conferred the privilege. What right or equity have the people of this State to require compensation for a franchise granted by the people of the United States? Again, he says, this right of State taxation is the only benefit derived, either by the State or the nation, for the franchise conferred. As though con-

gress has established this banking system, and enacted laws destructive to State banks, without deriving some advantage to the general government! Was the system adopted simply to benefit the States, by giving them a right to tax the shareholders? and is it true that the nation is to derive no benefit except through State taxation? It would be an insult to common intelligence for us to occupy time in showing the benefits directly derived by the general government, and the people of all the States, in the practical operation of this system of banking. It would seem clear that congress cannot confer any sovereign power upon the States which the States do not already possess, and cannot surrender to the States any of the powers conferred upon the federal government by the Constitution.

VI. Admitting for the moment that congress may grant permission to the States to tax these shares of stock, and that such permission is fully granted by the 41st section of the act of June, 1864, yet there is provided in the same section a further condition to the exercise of that right, which, under the existing laws of this State, utterly prohibits the levying of this tax. The language is, " *Provided, that the tax so imposed under the laws of any State upon the shares of the associations authorized under this act, shall not exceed the rate imposed upon the shares in any of the banks organized under the authority of the State where such association is located.*" Now, construing this language strictly, and the condition provided is not performed by the State, as there is no law in this State imposing any tax whatever upon the shares of stock in State banks, but it will be said that State banks are taxed on their capital to the full extent that such capital is subject to taxation, and that a tax upon the capital of a bank is the same in effect as a tax upon the respective shares of its capital. But this is " blowing both hot and cold." On one branch of the argument, we are told there is a wide distinction between a tax upon the capital of a national bank and a tax upon the shares of the bank; but when the same rule is to be applied to a State bank, we are told that in effect and practical result, a tax upon the capital and upon

the shares, is one and the same thing. This sort of quibbling is not becoming so important a subject. The question on this branch of the case is the same as on the other branch, viz., one of intention. What, we ask, did congress intend by inserting this proviso or condition? what mischief was it of State legislation that congress designed to defeat? what protection to national banks did congress expect to afford? Why did they insert the condition at all, but for the express and only purpose of placing these national banks on as favorable a footing as State banks? It is too plain for argument, that the intention was that a national bank, of a given capital, should not be required by the States to pay twice the amount of State taxation, that a State bank standing by the side of it pays with a like capital. If congress intended anything, it certainly intended to prevent just such inconsistencies as have occurred all over this State. In the same city in which this bank is located, we have one State bank with a capital of six hundred thousand dollars, which is assessed this year upon a valuation of one hundred and fifty-eight thousand dollars; another of four hundred thousand dollars capital, which is assessed upon a valuation of one hundred and fifty-five thousand dollars; and another of a capital of one hundred and twenty-five thousand dollars, assessed upon a valuation of fifty-five thousand dollars, because they have invested the greater part of their capital in government securities; while this national bank, with a capital of three hundred thousand dollars, all of which is invested in the same securities, is assessed to the full amount of three hundred thousand dollars, by assessing the respective stockholders; and such is the practical result all over the State. A. and B. are each the owners of $100,000 of government bonds. A. invests his in the organization of a State bank. B. invests his in the organization of a national bank. The bank of A. is free from State taxation, while B. is taxed to the full amount, by taxing his shares of stock. Can it be said in any sense, that the rate of taxation is the same in both instances? Justice DANIELS seems to admit that it was "the intention of congress to protect the shares of the

national institutions against inequality and unjust discrimination," but says: This intention "is well complied with by the adoption of a general and equal standard of taxation, so far as it is possible to prescribe it, for the State and national banking institutions alike. If certain State banks are able to avoid taxation altogether, by reason of the investment of their capital in United States stocks,     *     *     *     * it does not shield other banks from taxation that have done nothing of that kind." But the learned justice was never more mistaken, than in saying, that this constitutes an "*equal standard of taxation, so far as it is possible to prescribe it, for State and national institutions alike.*" If it is competent for the State to tax the shares of national banks, it is certainly possible for the State to tax the shares of State banks, notwithstanding their capital may be invested in national securities. If the legislature were really desirous of preventing this large moneyed interest from escaping State taxation, why did not they not include in the section of the enabling act, a provision for the taxing of the shares of State as well as national banks. For before the passage of that act, it had been held by the Supreme Court of the United States, that the capital of State banks could not be reached for the purposes of State taxation, in so far as it was invested in government securities. The conclusion to our minds is irresistible, that the intention of the legislature was to place the State banks on a more favorable footing than the national banks, as respects the subject of taxation. And Justice DANIELS further illustrates his position by saying: "It is a reasonable compliance with this provision, that the rule of taxation is enforced in the same manner upon all banks, both State and national, so far as any measure of taxation can be applied to them, and that is sufficient, because it secures the observance of the promise that the shareholders in the national associations, shall be taxed at the same rate as those owning stock in the banks created under the State laws.     *     *     *     *     * In this connection, the banks not taxed on account of their capital being invested in government securities, must be

regarded as simply creditors of the government without taxable property." It is submitted that practically the rule of taxation is not enforced in the same manner upon State as on national banks; that it does not secure the observance, in any sense, of the promise that the shareholders in State and national banks shall be taxed at the same rate; and that a State bank, investing its capital in government securities, is no more "a creditor of the government without taxable property," than is a national bank investing its capital in the same securities; and that this mode of taxation is not carrying out the spirit or intent or letter of the condition imposed by congress. The word "*rate*" as used in the statute, does not refer exclusively to the ratio of the tax; to thus limit its meaning, would be absurd. Congress certainly did not intend to say to the States, you must not impose a tax of two mills on the dollar upon the shares of national banks, unless you impose the same tax of two mills upon the shares or capital of State banks, yet you may impose a tax of two mills upon the shares of national banks, but in taxing State banks you may value their capital at one-half or one-quarter in case they have invested the rest of their capital in government securities, and thus, in fact and effect, accomplish the very same practical result that you would accomplish by the course prohibited. Could anything be more absurd? The intention of congress was one of substance, but the construction given by Justice DANIELS would make their act but "a play upon words," an idle form, and of no effect whatever.

VII. We do not deem it necessary to trouble the court with an extended argument, to show that, aside from all questions of a national character, this tax is illegally assessed as to all the stockholders residing without the limits of the first ward of Utica, and shall content ourselves with citing the provisions of the statute with which the tax conflicts.

Every person shall be assessed in the town or ward where he resides, when the assessment is made for all personal estate owned by him. (1 R. S., 389, § 5; id., 908, § 5, 5th ed.)

· The act of congress as to the place where the assessment shall be made, cannot operate as a repeal of an express

statute of the State. The most that can be claimed is, that congress has granted to the State permission to tax these shares of stock, in case the State shall choose so to do.; provided they are assessed at the place where the bank is located, and not elsewhere. There is nothing making it obligatory upon the States to tax them. At best, therefore, it is but discretionary with the States, and which discretion can only be exercised by the legislative branch of the State government. It cannot be that this tax is to be imposed or not, in the discretion of the town assessors. If the States are to avail themselves of the privilege granted, they must so alter and amend their laws as to comply with the condition imposed, and denote an acceptance of the privilege offered. And this is the construction given to the act by the last legislature, for by the provisions of the enabling act (Laws 1865, p. 169), they have changed the laws as to the taxation of personal property, in so far as it relates to the shares of national banks; but at the time the assessment in question was made, the assessors had no jurisdiction to assess a person for personal property, where he is not a resident of their ward or town at the time when the assessment is made. (*Mygatt v. Supervisors of Chenango*, 1 Kern., 563; *Mygatt v. Washburn*, 15 N. Y., 316.)

*Lyman Tremain*, for Van Allen.

I. By express provisions contained in acts of congress, the bonds and securities held by the First National Bank of Albany, and in which its entire capital stock was invested, were declared exempt from taxation, by State or municipal authority, in the hands of corporations or individuals.

1. $125,000 were in 7-30 treasury notes, issued under an act approved March 3, 1865, which declared that " all bonds, or other obligations issued under this act, shall be exempt from taxation by or under State or municipal authority." (§ 2.)

2. $149,000 were in five per cent bonds, issued under an act approved March 3, 1864, which contained a similar provision. (§ 1.)

3. $151,000 were in six per cent bonds, issued under act approved February 25, 1862, which contained the following declaration :

"And all stocks, bonds and other securities of the United States held by individuals, corporations or associations within the United States, shall be exempt from taxation by or under State authority." (§ 2.)

These sums make $425,000, or $125,000 more than the capital of $300,000, and the surplus of $100,000.

4. In addition to these acts another was passed after the banking act of 1864, and was approved June 30, 1864, which contains the following provision :

"And all bonds, treasury notes and other obligations of the United States shall be exempt from taxation by or under State or municipal authority." (§ 1.)

These provisions are declared by the Constitution of the United States to be the supreme law of the land, anything in the Constitution or laws of a State to the contrary notwithstanding. (Art. 6, Const. of the U. S., § 2.)

II. Independent of any express declaration by congress, all such bonds and securities are exempt absolutely from State taxation, by virtue of the Constitution of the United States, and such has been the law long settled by the Supreme Court of the United States. ( *Weston* v. *City of Charleston*, 2 Pet., 449 ; *Bank of Commerce* v. *City of New York*, 2 Black., 620 ; *Bank Tax Case*, 2 Wallace, 200.)

For a full vindication of this rule, and to show that it is the result of the power conferred on congress to borrow money, see remarks of MARSHALL, Ch. J., in 2d Peters, 465. He says :

"But it is unnecessary to pursue this principle through its diversified application to all the contracts, and to the various operations of government. No one can be selected which is of more vital interest to the community than this of borrowing money on the credit of the United States. No power has been conferred by the American people on their government, the free and unburdened exercise of which more deeply affects every member of our republic. In war, when

the honor, the safety, the independence of the nation are to be defended, when all its resources are to be strained to the utmost, credit must be brought in aid of taxation, and the abundant revenue of peace and prosperity must be anticipated to supply the exigencies, the urgent demands of the moment. The people, for objects the most important which can occur in the progress of nations, have empowered their government to make these anticipations, 'to borrow money on the credit of the United States.' Can anything be more dangerous or more injurious than the admission of a principle which authorizes every State and every corporation in the Union which possess the right of taxation, to burden the exercise of this power at their discretion?

"If the right to impose the tax exists, it is a right which in its nature acknowledges no limits.

"It may be carried to any extent within the jurisdiction of the State or corporation which imposes it, which the will of each State and corporation may prescribe. A power which is given by the whole American people for their common good, which is to be exercised at the most critical periods, for the most important purposes, on the free exercise of which the interests certainly, perhaps the liberty of the whole may depend, may be burdened, impeded if not arrested, by any of the organized parts of the confederacy."

III. The exemption from taxation, which belongs to these securities, from their own nature, attaches to and follows them, when they become the property of a banking corporation in the State of New York. (See the case in Black and Wallace, above cited, and especially the remarks of Judge Nelson in the last case, on page 208. The banking act of congress is substantially framed on the same principles with the New York general banking law of 1838, and is discussed by Judge Nelson in the case in 2d Wallace.)

IV. The act of congress authorizing the creation of national banking associations, or corporations, does not subject these securities to taxation by State authority, in the hands of the stockholders.

That provision, after declaring that a certain tax on their

circulation should be paid to the federal government, "in lieu of all other taxes," contains the following language:

"*Provided,* That nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation, in the assessment of taxes imposed by or under State authority, at the place where such bank is located, and not elsewhere, but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such States; *Provided, further,* That the tax so imposed under the laws of any State, upon the shares of any of the associations authorized by this act, shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the State where such association is located." "Provided, also, that nothing in this act shall exempt the real estate of associations from either State, county or municipal taxes, to the same extent, according to its value, as other real estate is taxed." (§ 41.)

1. Its language does not subject the shares to taxation, but saves such shares from being declared exempt by virtue of the banking act of congress.

2. It cannot be construed as repealing the provisions cited under point 1st, declaring these bonds exempt from taxation, on the familiar principle that repeals by implication are not favored, and that if it is possible for both laws to stand, they must be so construed.

3. Assuming for argument (which is denied), that congress might subject bonds issued on the credit and faith of the people, that they should be exempt from taxation, to such taxation, after the holders had loaned their money to the government, nothing but the clearest language could show that congress intended to do an act so plainly in conflict with the terms on which the loans were made.

4. The history of the course of adjudication, on the question of the power to tax by the State, any instrumentality of the federal government like a national bank, shows the purpose of the provision in question.

Such a bank being, as its public purposes show, in part a fiscal agent of the government, it was itself exempt from taxation, as was held, substantially, in the following cases: (*Sturges* v. *Crowenshield*, 4 Wheat., 122; *Houston* v. *Moore*, 5 id., 1; *Dobbins* v. *Commissioners Erie Co.*, 16 Peters, 435; *McCullough* v. *State of Maryland*, 4 Wheat., 316; *Weston* v. *City Council of Charleston*, 2 Peters, 449; *Osborn* v. *President, &c., Bank of United States*, 9 Wheat., 738; *Brown* v. *Maryland*, 12 id., 419.)

In *McCullough* v. *The State of Maryland* (4 Wheat., 316), Judge MARSHALL had recognized the right of the State to tax stock in a national bank in the following language: "This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed upon the interests which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State."

This language, erroneously cited sometimes as warranting the doctrine that government securities owned by a bank are taxable, was never intended to subject property exempt in its own nature, to taxation.

Judge MARSHALL, himself, explains that language and repudiates such a construction, in the case in 2d Peters, on page 467. He says:

"It has been supposed that a tax on stock comes within the exception stated in the case of *McCullough* v. *The State of Maryland*. We do not think so. The Bank of the United States is an instrument essential to the fiscal operations of the government, and the power which might be exercised to its destruction was denied. But property acquired by that corporation in a State, was supposed to be placed in the same condition with property acquired by an individual.

The tax on government stock is thought by this court to be a tax on the contract, a tax on the power to borrow money on the credit of the United States, and consequently to be repugnant to the Constitution."

Again at page 467, he there shows that States have no jurisdiction over this subject.

" All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are upon the soundest principles exempt from taxation." " The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission;" but not " to those means which are employed by congress to carry into execution powers conferred on that body by the people of the United States." " The attempt to use " the power of taxation " on the means employed by the government of the Union in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give."

THOMPSON, J., in dissenting from the opinion of the court, in *Weston* v. *City of Charleston* (2 Peters, *supra*), recognizes the sweeping effect and force of the decision made by the court. Thus, at page 476, he says : " If the objection to this tax is to be sustained, it must be on the broad ground that stock of the United States is not taxable in any shape or manner whatever; that it is not to be included in the estimate of property subject to taxation, and that, I understand, is the extent to which a majority of this court mean to carry the exception."

The object of this proviso, therefore, was to leave the property of shareholders liable to be taxed in common with other property of a like description throughout the State. As these national banks were only required to invest one-third of their capital stock in federal securities (see sec. 16 of the National Banking Act), the remaining two-thirds would, in most cases, remain liable to taxation by State authority.

A further object was to leave these shares exposed to taxation, although they might be invested in national banks, provided they would be liable if owned by individuals. A still further object was to prevent the expression " in lieu of all other taxes," from being construed to relieve the shares from taxation by State authority.

5. But further, by the express provisions of section 41, the

shares invested in U. S. bonds, or the portion so invested, are exempt from taxation by State authority, because such shares, if owned by a stockholder in a State bank, would be so exempt. (See the two cases above cited in Black. & Wallace.)

By the statutes of New York, all property exempt under the Constitution of the United States is also declared exempt. (See 1 R. S., 5th ed., 906, § 5.)

V. Shares in national banks are property and merely represent parts of the capital stock of such banks, and must of course be exempt, if the whole is exempt.

Section 6 of the banking act requires that the organization certificate shall specify " the amount of capital stock and the number of *shares* into which *the same* shall be divided, the names of the *shareholders* and the number of *shares* held by each of them."

Section 12 provides "that *the capital stock* shall be divided into *shares* of one hundred dollars each, and be deemed personal property, transferable," &c.

VI. Independent of the authority conferred by the act of congress, the States have no power to tax shareholders in a national bank, because such banks are agents or instruments of the federal government, and the existence of such a power might lead to the destruction of the banks. (See the authorities cited, and the first half of the opinion by MULLEN, J., in *The City of Utica* v. *Churchill et al.*) The *dictum* by Judge MARSHALL, in *McCollough* v. *Bank*, in 4th Wheaton, is inconsistent with the more recent cases, and with the opinion of the court as pronounced by himself. (See cases under point IV.)

VII. The New York statute of March 9th, 1865, so far as it authorizes the taxation of shares in national banks, is unconstitutional and void, because the proviso contained in the banking act of congress is wholly ignored and repudiated, and because, under the laws of New York, as they now exist, shares in State banks are not taxable at any rate, or for any amount. (Act of Congress, § 41.)

*a.* Congress, in creating corporations, had undoubted power to prescribe the conditions on which the corporators should

accept their charter, among which might properly be included their submission to State taxation.   .

*b.* To preserve such corporations, it had also power to declare that the States should tax the shareholders, at no greater rate than they taxed other property of a like description.   " The power to create implies the power to preserve." (4 Wheat., 485, MARSHALL.)

*c.* By the laws of New York, no shareholder in a bank of the State is liable to taxation.   Section 14 of our tax laws (1 R. S., 5th ed., 907, § 14), reads as follows : " The owner or holder of stock in any incorporated company liable to taxation on its capital, shall not be taxed as an individual for such stock."   Title 4 of said laws declares all moneyed corporations liable to taxation on their capital and surplus.. (§ 1, 944, §§ 3, 7 and 10.)   This was modified by chapter 240 of the Laws of 1863, but this modification only changed the mode of ascertaining the amount of such capital and surplus. In 2d Wallace, 206, Judge NELSON thus characterizes the change : " Looking at the two acts, and endeavoring to ascertain the alteration or change in the law, from the language used, the intent of the law makers would seem to be quite plain, namely, a change simply in the mode of ascertaining or taxing the amount of capital of the banks which is made the basis of taxation."

*d.* The shareholders in State banks, not being taxable at all, and the capital of such banks not being taxable, where such capital is invested in government securities, it follows, that if shareholders in national banks are taxable, where the capital is invested in such securities, the States may tax them all out of existence, for the power of taxation being an attribute of sovereignty, and therefore uncontrollable, it follows, as was said by MARSHALL in 4th Wheaton, that " the power to tax involves the right to destroy." (p. 487.)

VIII. In any and every aspect of the case, the shareholders of the First National Bank are not liable to assessment, because such bank was organized under the law of congress of 1863, and the New York statute only applies to those banks which have been converted from State banks, or to

those national banks which were organized under the act of 1864. (See §§ 1 and 10 of the Statute of 1865.)

IX. The opinion of the court, in *The City of Utica* v. *Churchill*, will attract attention.

1. It proves that national banks are "lawfully created and are agencies for carrying on the operations of the federal government." It proves that the States cannot tax instruments or agencies of the government. It then attempts to prove that the States may tax national banks by taxing the shareholders!

2. It cites with approval the cases decided by the U. S. Supreme Court holding that the power to tax where it exists is sovereign, but in place of the immunity from such taxation declared by Marshall, substitutes an injunction against a State legislature if it taxes the shareholders so high as to evince an intent to embarrass or drive out the banks! As if doubting this power, however, it concludes that "this point is of no consequence."

3. It concedes the exemption from taxation of government bonds when owned by individuals, but declares their liability in the hands of an association.

4. It cites the two cases in South Carolina, which have been long since exploded by the later decisions in the U. S. Supreme Court, and substitutes for the national sovereignty asserted by Marshall, the State sovereignty of South Carolina, as asserted by her courts.

5. It denies the power of congress to confer on the States the power to tax, and yet it proves that congress, by creating corporations, has conferred on the States the power to tax hundreds of millions of property, which would be otherwise exempt.

6. It affirms the right to tax the stockholder for his stock, as distinguished from the tax on property, and thus attempts to sustain the tax on shares, although that precise distinction was discussed by counsel and overruled by the court in 2d Wallace, and although the same attempted refinement had been overthrown in *Brown* v. *State of Maryland* (12 Wheat., 419).

7. It admits the power of congress to create national banks, but denies its authority to prescribe conditions in their charter, or to establish a rule of taxation by the States, to preserve them from annihilation, although conceding that congress had a different view of the subject.

8. It treats the certificate of shares in a national bank as the representatives of an indefinable property other than capital stock, although Judge Nelson had overthrown that idea in the following terms: "Now when capital of the banks is required or authorized by the law to be invested in stocks, and, among others, in United States stocks, under their charters or articles of association, and this capital thus invested is made the basis of taxation of the institutions, there is great difficulty in saying that it is not the stock thus constituting the corpus or body of the capital that is taxed. It is not easy to separate the property in which the capital is invested from the capital itself. It requires some refinement to separate the two thus intimately blended together. The capital is not an ideal fictitious arbitrary sum of money, set down in the articles of association, but in the theory and practical operation of the system, is composed of substantial property, and which gives value and solidity to the stock of the institution. It is the foundation of its credits in the business community."

All these observations by the judge, made in reference to stock in a bank organized under the general banking law of New York, are entirely applicable to stock in national banks which are essentially of the same general character.

9. The attempt to distinguish shares in a bank from the stock of which they form a part, is contradicted in a subsequent admission, that if a bank has $100,000 of capital stock, that $100,000 of capital, and the $100,000 held by the share owners, constitute the same property, and only one ought to be taxed, for a tax on both would be a "double taxation."

10. It regards the proviso in the act of congress as an abortive attempt to grant the power of taxation to a State, instead of considering it merely as a removal of the shield of privilege to a limited extent, with a saving clause to the

effect that such removal should not leave the association exposed to the danger of destruction by State taxation.

Could not the United States have agreed with Dobbins that his compensation should be liable to State taxation?

Cannot congress, by law, provide for a loan, and declare, in the law, that the security it gives shall be subject to State taxation? and if it can do this, can it not further provide that such liability to taxation stamped upon the security, shall not exceed the liability of other property owned by the citizens of the State imposing the tax?

Would an acknowledgment of such a power result in proving that congress "might utterly abolish the government of the United States?"

Would this be deemed a "surrender of a vital power of government?" On the contrary, it is submitted that the charter of a bank, being a contract between the government and the corporation, the power to create the charter is rendered nugatory, unless the creator is clothed with authority to impose all conditions which may be deemed essential to the public welfare.

11. Finally, however, if this excellent State rights opinion is sound, then the only stockholder liable to taxation in this case is Peck, who resides in the 5th ward, because the statute of 1865 does not embrace the First National Bank, as shown under point IX, and the assessment is made in that ward.

X. No considerations of mistaken expediency should affect this case. The immunity claimed rests on a principle coeval with the government. If it is wrong, the people alone should correct it, by an amendment to the Constitution. To sustain it, assailed as it is anew, will inspire increased confidence in the strength and permanence of our institutions, while a concession to the attack now made may result in the repudiation of the national faith, pledged in the creation of that debt, which is the price of our national existence.

*Hand & Reynolds*, for Williams.

I. The taxation by State authority, in any form whatever, of property invested in loans to the federal government, is

forbidden by the Constitution of the United States. The ultimate tribunal upon such a question, has so decided in the broadest and most comprehensive terms. (*Bank of Commerce* v. *Tax Commissioners*, 2 Black., 620 ; *Bank Tax Case*, 2 Wallace, 200 ; *Weston* v. *City of Charleston*, 2 Peters, 449.)

1st. The cases cited show that whether the taxation by the State is in form directly upon the government securities themselves, *eo nomine*, as in the South Carolina case; or upon the *capital* of a corporation, which is invested in such securities as in the case in Black.; or upon the corporation itself upon a valuation equal to the amount of its capital stock paid in, where such capital is so invested, as in the latest case, it is equally within the intent and spirit of the prohibition ; and that no valid distinction can be raised by any ingenuity or peculiarity in the manner of laying the tax. A tax either upon the corporation or individual, on account of his property therein, is void. (NELSON, J., 2 Black., 629.)

2d. By the federal Constitution, congress is vested with the power to borrow money upon the credit of the United States. This power is beyond the control of the States, and cannot be in any way, either directly or indirectly, interfered with or restricted by them.

II. By the various acts of congress, also passed in accordance with the constitutional principle above referred to, all stocks, bonds, and other securities of the United States, whether held by individuals or corporations, are declared exempt from State taxation. And these acts being within, and proper to the exercise of the powers of the general government, are binding upon, and supreme over all the States. (Act of 1861–62, § 2, p. 346 ; Act of 1863–64, § 1, p. 218.)

III. The tax attempted to be laid by the legislature of this State upon the shareholders in national banks, on account of the shares of capital stock held by them, is, when such capital stock is invested in government securities, both by authority and upon principle, in effect a tax upon the securities themselves, and, therefore, as we have seen, unconstitutional. (Laws of 1865, p. 172, § 10.)

1st. This point must be regarded as substantially decided in the recent bank tax case. (2 Wallace, *supra*.)

The court had previously adjudged (2 Black., *supra*) that a tax upon the capital of a bank, when such capital was invested in U. S. securities, cannot be laid.

To avoid the effect of that decision, the New York legislature, in 1863, enacted that moneyed corporations should be assessed "upon a valuation equal to their capitals paid in, or secured to be paid in," thus endeavoring to create an "object" of taxation separate from and independent of the capital. (Laws of 1863, p. 435.) But, says NELSON, J. (2 Wallace, *supra*), in commenting upon this statute: "The capital is, after all, made the *basis* of taxation. There is great difficulty in saying that it is not the stock constituting the corpus or body of the capital that is taxed. It is not easy to separate the property in which the capital is invested from the capital itself. The capital is not an ideal and fictitious arbitrary sum of money set down in the articles of association, but, in the theory and practical operation of the system, is composed of *sub*stantial property." And he therefore repudiates any distinction between this method and taxation upon the capital itself.

It is insisted that this reason is entirely applicable to the present statute.

Here the legislature have attempted to avoid taxing the capital directly, and tax instead the shareholders upon a valuation which shall not be greater than the par value of their shares of the capital. The only difference between this and the former law is, that in the one case the legislature attempt to tax a "valuation" equal to the whole capital and in the other to tax a "valuation" equal to that part or "*share*" of the capital which the person assessed holds. Manifestly there can be no genuine distinction between the two. The same constitutional principle must be applicable to both. As one has been decided to come within it, so must the other.

2d. But upon principle there can be no difference between taxing the capital stock of a bank invested in federal securities, which has been decided to be forbidden by the Constitu-

tion, and taxing the stockholders upon their shares of that capital. If the capital, as a whole, is exempt, its parts must also be. And a shareholder is but an owner of a share or portion of the capital. A share of stock is a share of the capital.

1. Webster defines "stock" to be the money or property employed in any trade or business operation.

2. The Revised Statutes use the words "capital," "capital stock" and "property," indiscriminately, to designate the funds of a moneyed corporation. (1 R. S., 424, §§ 1, 6, 10; COMSTOCK, J., 23 N. Y., 222.)

3. An incorporated joint stock company is an association in which the capital stock is thrown into a mass and employed for the general benefit, each participating in the gain, according to the proportion of stock or capital which belonged to him. (Wordsworth on Joint Stock Companies, 39 Law Library, p. 1.)

4. The capital is raised by the mutual subscription of its members and is divided into shares, which are made to vest in the subscribers according to their respective contributions; and they entitle the holders of them to a corresponding proportionate part of the profits of the undertaking. (Ang. & Ames on Corp., § 556.)

5. The capital stock of a corporation may be taxed as an aggregate to the corporation, or to the stockholders, on account of their separate ownership of it. (Ang. & Ames on Corp., § 461.)

6. It will be seen, therefore, that the stock of a moneyed corporation is nothing more or less than its capital. But that stock is vested in and belongs to each of the shareholders according to the number of shares he holds, and he who holds a certain number of shares of stock owns as many portions of its capital.

7. His scrip invariably certifies that he owns so many shares "of the capital stock."

8. The ownership of stock gives to the owner an undivided interest as owner in the property of the corporation, which bears the same proportion to the whole property as his share

does to the whole number of shares. (*Miller* v. *Railroad*, 24 Barb., 329, PEABODY.)

9. When a corporation agrees that an individual is entitled to a certain number of shares of its capital, he becomes a stockholder. (*Chaffee* v. *Cummings*, 30 Maine, 83.)

10. All the obscurity upon this subject has arisen from confounding the question, "what stock is," with that as to what it entitles its holders. It is true that, although the stockholder owns a certain share of the capital, he cannot withdraw it, nor control nor in any way obtain possession of his portion of that capital, until the corporation is wound up, and the purpose for which he placed it there accomplished or abandoned. He parts with the control of his property, and intrusts it to an artificial being to manage in trust for him, but he does not lose his title to it any more than a partner loses his title to his share of the joint fund, though he cannot alone control it or withdraw it. Stock is not the right to participate in the gains of a corporation, and vote for its directors. These are not the stock itself, but are privileges derived from its ownership. Stock is not a right, it is a chattel. It might as well be said, that when a man leases his land and thus excludes himself from its possession and control, his estate itself is the right to receive the rents, instead of that right being but a consequence of his title in and ownership of the land. It is true that all the stockholders together cannot confer the possession or control of the common fund, but this is not because they do not own it, but because each one of them has already intrusted the control of his part to an artificial being as his trustee. (*Carpenter* v. *N. Y. & N. H. R. R.*, 5 Abb., 277.)

11. But even if the share of a stockholder is only his right to a certain proportion of the gains of the corporation, and not a portion of the capital, still it is difficult to see, if the capital invested in government securities is exempt, this sole beneficial right in that capital should not also be exempt. For, if it were permitted to tax the latter *ad libitum*, the whole actual value of the capital might be destroyed and the securities themselves be rendered entirely worthless.

And it is no answer to say that, however much the stock might be depreciated by taxation, the capital itself, or rather, the securities in which it is invested, would remain the same. Nominally, they might, but their actual value would depreciate in proportion, just as an onerous tax upon the profits or right to receive any profits arising from land or any other species of property, not laid in proportion to the amount of the profits, but to the amount of the property itself, would burden and depreciate that property.

The fact that the value of stocks do sometimes rise and fall, while the value of the property in which the capital is invested remains unaffected, does not invalidate the argument.

Stocks may be depreciated independently of the value of the capital, because that capital is not well managed, or the profits arising from it are misapplied or wasted, but such depreciation is radically different from one which is the consequence of a burden imposed upon the stock, arbitrarily graduated in its weight to the amount of the capital itself— such a burden is really upon the capital, because it is greater or less upon the right to receive the profit of the capital just in proportion to the amount of that capital.

3d. The remark made by Ch. J. Marshall at the close of his opinion, in *McCullough* v. *State of Maryland*, has no application to the present case. The charter of the United States Bank does not require its capital to be invested in United States securities, nor was it so invested. That decision went upon the ground that the bank itself could not be taxed, because it was an "instrument employed by the government to carry its powers into operation." The question of taxing capital invested in United States securities, or individuals holding them, did not arise in that case, and was not there discussed. (*McCullough* v. *Maryland*, 4 Wheat., 316.)

IV. These national banks, like the old United States Bank, and like custom house officers, are the machines or means for carrying on the moneyed operations of the government. Any taxation by the State, of these instruments themselves, or of the shares of the banks or the salaries of the officers,

would necessarily embarrass and hinder such operations. It would be a "tax on the *operation* of instruments employed by the government to carry its powers into operation." Officers must have compensation, and banks must have shares and shareholders, and neither the one nor the other of these instruments can "*operate*" without them. (*Osborn* v. *United States*, 9 Wheat., 738; *Dobbin* v. *The Commissioners*, 16 Peters, 435.)

V. The proviso in the act of congress authorizing the organization of these banking associations, does not confer any validity upon this assessment. (Acts of 1863–64, p. 111, § 41.)

1st. It declares that these associations shall pay to the general government, in lieu of all other taxes, one-fourth of one per cent upon all capital not invested in United States securities, and proceed to enact that nothing contained therein, shall be construed to prevent all the shares in said associations, held by any person, from being included in the valuation of the personal property of such person, in the assessment of taxes imposed by State authority, provided that the tax so imposed by the laws of any State upon such shares, shall not exceed the rate imposed upon the shares in any of the banks organized under State authority.

1. It does not upon its face pretend to give such right, but merely provides that the act shall not be construed as taking away any which should have before existed. It, therefore, leaves the matter untouched.

2. Even if it could be construed as expressly conferring upon the State, the right to assess shareholders upon such shares, it is inoperative in this State; for here the shareholders in State banks are not assessed, at any rate on account of their stock, and as this act only allows an assessment at the same rate as the latter is assessed, no assessment can be directed by our legislature, except in violation of the act. (1 R. S., 388, § 7; Acts of 1863–64, 111, § 41.)

3. The act itself does not venture to tax any part of the capital stock of such associations, invested in United States

securities, and cannot confer upon the States any power to do so. Such an attempt would, as we have seen, be unconstitutional.

If the capital stock of one of these institutions is all invested in United States securities, and, as has been shown, to tax by State authority the shareholders upon the value of their shares, is forbidden by the Constitution, and other acts of congress independent of this banking act; then the grant to the State, claimed to be contained in this proviso, of power to impose such tax, would be void. Clearly, congress cannot authorize a State to do what the Constitution prohibits it from doing. Otherwise it might grant to a State the right to coin money, declare war, make treaties, and thus dissolve the Union.

4. This proviso is no condition of the franchise granted by congress. It does not affect the institution itself, at all. How, if it were, could the bank prevent a forfeiture of its charter? It has no control over its stockholders, and could not compel one of them to submit to be taxed by the State. The permission, if any, is not to tax it, but them. The judgment of the court below should be affirmed.

I. It is believed that no legal right is claimed or asserted, on the part of the State, to tax the corporations known as national banks, organized under the act of congress of June 3d, 1864, or the bonds and securities of the United States, held by such banks or by individuals, or upon the capital of such banks invested in United States securities. That there is no such right of State taxation is settled. (*McCullough* v. *State of Maryland*, 4 Wheat., 316; *Osborn* v. *U. S. Bank*, 9 id., 738; *Weston* v. *City of Charleston*, 2 Peters, 449; *Bank of Commerce* v. *Commissioners of Taxes*, &c., 2 Black., 620; *Bank Tax Case*, 2 Wallace, 200.)

II. But the claim is of the legal right to tax for State, county and municipal purposes, the stockholders in such national banks, for so much personal property as the shares held by them respectively in such banks shall represent at its par value, and on the part of the respondent the right to do this is denied.

1. If the State possess this power of taxation, it cannot be denied that the act of the legislature (ch. 97, § 10 of the Laws of 1865) has attempted to impose it. The question, therefore, is one of mere power, and it cannot be controlled by any considerations of policy.

2. The 41st section of the act of congress of June 3d, 1864, under which national banks are organized, contains the following provisos : "*Provided,* That nothing in this act shall be construed to prevent all the shares in any of the said associations held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation in the assessment of taxes, imposed by or under State authority, at the place where such bank is located, and not elsewhere, but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State. *Provided, further,* That the tax so imposed, under the laws of any State, upon the *shares* of any of the associations authorized by this act, *shall not exceed the rate imposed upon the shares in any of the banks* organized under the authority of the State where such association is located."

3. This provision of the act of congress does not in terms confer upon the State any power of taxation. The most that can be claimed from it is, that nothing in the act shall be construed to prevent taxation of the shares by the States, if independent of the act the State has authority to levy the tax.

And if there is authority in the State to impose the tax, and it shall be levied, it is positively forbidden that the rate of taxation of the shares of national banks shall be any greater than is imposed upon the shares of banks created by the State authority.

4. If, therefore, this provision of the act of congress is to be respected, it is decisive of the present case against the right to tax the plaintiff and his associates, for there is no law of this State imposing any tax or rate of taxation upon any of the shares of stock held by individuals or combinations in State banks.

5. The act of the legislature entirely ignores the provision of the act of congress last referred to and directs the taxation of the shares in national banks, without any regard to it, and if it can be upheld it is in direct opposition to the law of congress. It is submitted that the State law is utterly void.

6. If it be admitted, as it must be, that congress has authority to create national banks, to do business within the limits of a State, it must have power to preserve them from destruction. The most that can be claimed under the act of congress is, that in respect to taxation, the shares of national banks should be subjected to no greater taxation than the shares of State banks, but this act of the legislature is in direct violation of that theory, for it proposes to tax the shares in national banks, when the shares in State banks are but the subject of taxation.

III. But independent of the act of congress, in its provisos it is submitted, that the State has no power to tax the stockholders in national banks.

1. The entire capital of the plaintiff's bank is invested in securities of the United States, which are exempt from State taxation.

2. The taxation of the shareholders for the par value of the shares held by them is in effect the taxation of the property of the bank. It comes to precisely the same result as if the tax was directly laid upon the bank, and the act of the legislature attempts to make the bank liable for the payment of the tax upon the stockholder.

3. There is no substantial difference between taxing the shares of the bank in the hands of the stockholder, and taxing the bank upon a valuation equal to the amount of its capital, as was attempted in 1863 and which did not succeed. (Bank Tax Case, 2 Wallace, 200.)

4. The shares represent the capital stock of the bank and they have no value disconnected with the property of the bank. By taxing the shares the capital is indirectly taxed, and if the capital is taxed so is the property of the bank, and this consisting wholly of the securities of the United States, is forbidden. (2 Wallace, 200.)

*A. J. Parker*, for Nolan.

I. The shares of stock in the national banks are declared to be personal property. (Ch. 106, § 12, Sess. 1 of 38th Congress.)

All lands and personal estate within this State, whether owned by individuals or corporations, are declared by the statute to be liable to taxation, subject to the exemptions therein declared. (1 R. S., 5th ed., 905, § 1.)

And one of the exemptions is declared by the statute to be " all property, real and personal, exempted from taxation under the Constitution of this State, or under the Constitution of the United States." (1 R. S., 5th ed., 906, § 5.)

Congress has no power to declare any species of property exempt from State taxation, except it be property exempted by the Constitution of the United States.

The courts have pronounced the taxation of United States bonds void, on the sole ground that it was a violation of the Constitution of the United States.

II. The Constitution of the United States has not, in express terms, exempted either national banks or United States bonds from State taxation. But it has been decided by the United States Supreme Court that they are exempt by implication, for the several reasons hereinafter mentioned.

In regard to the power of a State to tax the United States Bank or its branches, it was held that " the State governments have no right to tax any of the constitutional means employed by the government of the Union to execute its constitutional powers," and " no power by taxation or otherwise, to retard, impede, burthen, or in any manner control the operations of the constitutional laws enacted by congress, to carry into effect the power vested in the national government." (*McCullough* v. *The State of Maryland*, 4 Wheat., 436, 466.)

In regard to the power of a State to tax United States bonds, the reason given against its exercise was, that " it is a tax on the contract between the government and the individual," a tax on the power to borrow money on the credit of the United States, and consequently repugnant to the Con-

stitution." (*Weston* v. *The City of Charleston*, 2 Peters, 465, 469 ; *Bank of Commerce* v. *City of New York*, 2 Black., 620 ; *Bank Tax Case*, 2 Wallace, 200.)

III. If it is claimed that this tax is not maintainable because the bank in which the shares are owned is a national institution and one of the constitutional means employed by the government, the answer is the bank is not taxed.

Though taxing the bank itself, which was the active, living instrument of the government, was, for that reason, held to be unconstitutional, it has always been held that the interests of the shareholders were not within either the prohibition or the reason for it, and so it was declared by Chief Justice MARSHALL, in the case of *McCullough* v. *The Bank of Maryland*, above cited ; for it was held in that case, that though the legislature of Maryland had no power to impose a tax on the bank of the United States, and that such a tax was unconstitutional and void, yet that the State might tax the real estate owned by the bank, and the shares of stock which the citizens of Maryland held in the institution. (4 Wheat., 436.)

It has been expressly decided that stock in the bank of the United States held by individuals, may constitutionally be taxed by a State. (*Bulow* v. *The City of Charleston*, 1 Nott & McCord, 527 ; *State* v. *Collector*, 2 Bailey, 654.)

And it is believed that no different rule of law on this point has been claimed, either in the State or U. S. Courts.

(For the reason for this discrimination between taxing the bank and taxing the shareholders, see next point.)

IV. If it is claimed that this tax is not maintainable under the decisions in 2 Peters, 2 Black. and 2 Wallace, above cited, we answer, the tax is not on the stock of the United States, nor on the bank owning such stock, as it was in the cases cited.

The bank is a corporation — an artificial person, and has an independent legal existence and is the legal owner of the bonds. The bank alone can buy and sell and control the corporate property, and the bank alone can be taxed for any taxable property it may own.

The stockholder is, in no sense, the legal owner of the bonds. He did not buy them and cannot sell them. He can exercise no control whatever over them. He has no right to their custody, or even to see them. They cannot be sold at law, or reached by proceeding in equity to satisfy a debt of the stockholder. They are only liable for a debt of the corporation. The holder of the bills, and not the shareholder, has the first claim on the assets of the bank, and is the better entitled to be called the owner.

The shares of stock belonging to the shareholder, are only choses in action, in regard to which his only claim is on the corporation, and not on the United States. Those shares represent a business enterprise—profit or loss by banking, surplus profits—an interest too, perhaps, three times the amount of the capital in discounted paper, or credits at other banks, and an interest in or liability for a circulation of bank notes. The shares of stock represent the investment, the speculation, whether it be a good one or a bad one; and it is almost invariably the former, the profits being very large, generally from 15 to 40 per cent. The case shows that the bank represented in the secondly above entitled cause, has acquired a surplus of $100,400, and capital of $300,000, in doing business a little over a year—thus showing a profit of about 33 per cent in addition to the dividends already made.

The bank owns the U. S. bonds. The shareholder in the bank owns merely the right to a share of the profits made in banking on such bonds.

The shareholder paid his money to the bank, not for U. S. bonds, but for a chance in the speculation, and he took a certificate accordingly. The bank may own the U. S. bonds one day and sell them the next, but the stockholder's rights and interests remain the same. They are in no way affected by the question whether the bank does or does not own any U. S. bonds.

There may be a large surplus of profits belonging to the bank, exceeding the value of the U. S. bonds that the bank may own; but neither the bank nor the shareholder can be

taxed for such surplus—the bank not being taxable at all, and the limit of taxation on the shareholder being the par value of his stock. (Chap. 106, § 41; Sess. 1, 38th Congress.)

The contract to be protected by the Constitution is between the government and the corporation, not between the government and the shareholder.

There is a reason for not taxing a bond held as an investment. There the holder is restricted in his profit to the interest agreed to be paid. To tax the holder would lessen a fixed compensation. But when the privilege and profit of banking on the bond are given, the reason for exemption no longer exists. The tax is on the franchise and not on the bond, and such was the view taken on this subject in congress when the act under which these banks were authorized was passed, containing the express authority to tax the shareholders.

In the case in 2 Black., it seems to be conceded that the State may tax the nominal capital of a bank without regard to value or valuation, whether it held U. S. stocks or not — for in that case it would tax the franchise and not stock; and the distinction here is still wider between the shares of the stock and the bonds held by the corporation, than it would be between the nominal capital of a State bank and the U. S. bonds in which it was invested.

V. Thus far we have examined the right to tax these banks, as it exists, independent of any action of congress. But the act of congress, chap. 106, first session of the 38th congress, § 41, passed June 3d, 1864, under which national banks are organized, expressly permits the stockholders of such banks to be taxed on all their shares, and it gives this permission in the same act by which it provides for investing the capital stock or a portion of it in U. S. bonds.

And that it was not deemed to be a taxing of the bonds, is evident from the fact that no deduction is provided for, or required to be made for the capital so invested.

The only proviso is, that the rate shall not be greater than is assessed upon other moneyed capital, or on banks organized under State authority.

Stockholders in national banks cannot be assessed at the rate of two per cent, when State banks are assessed at the rate of one per cent. There is no ambiguity in the language employed, nor any doubt as to the meaning of the word rate.

It is conceded that congress has no power to regulate the machinery of State taxation — and, perhaps, none to say where the tax shall be assessed. And it is conceded that congress can confer no additional powers on State governments.

But has not congress the power to surrender a claim as regards property belonging to the United States? May it not waive a right?

We do not think congress has done so in this case, for we have already shown that the right to tax bank shares exists independent of any action of congress. But would not congress have the right to say the State might tax certain bonds which it then proposed to issue?

The immunity from taxation is adjudged on the sole ground, and only so far as such exemption is necessary for the national credit or for the public interest. Congress is the sole guardian of that credit and of such interests; and if congress, in its discretion, decides that the public interests require that such exemption should be waived, surely the waiver would be valid and effectual.

Although, therefore, congress by its enactment, can add nothing to the force of the constitutional prohibition, yet, inasmuch as that constitutional prohibition, resting only on implication, extends no further than the protection of the public interest may require, and as congress is the sole judge of the extent to which such protection is necessary, congress may, in its discretion, waive the exemption.

The holder of a U. S. bond cannot complain of such an exemption, when the same act of congress conferred on him a franchise, and the means of adding largely to his profits by using the bonds for banking, and when the exemption from taxation was only to be waived in case the holder should elect to avail himself of the additional profits afforded him by such use of the bonds. In permitting the States to tax the share-

holders, congress recognizes the right of the State in which the bank is located, and whose laws and officers protect the persons and property of the stockholders to call for a contribution of a joint portion of the expense; and congress also, by the act in question, initiates a policy which, by equalizing the burdens of taxation, satisfies the public sense of justice, and thus strengthens the public credit.

VI. The property being by law taxable, the legislature has provided fully as to the mode and place of taxation, by passing an enabling act, and reënacting the provision made by congress, by which shareholders were to be subjected to taxation. (Ch. 97, § 10 of Laws of 1865; Sess. Laws of 1865, p. 172.

VII. But it is said, this enabling act of our State legislature does not apply to "The First National Bank of Albany," represented in the secondly above entitled action, because that bank was organized under the act of February 25, 1863, and not as is alleged, under the act of June 3, 1863.

The enabling act is declared, in the 10th section, to apply to all banking associations, organized under that act, or under the act of congress of 1864, mentioned in the first section.

The act of 1863 was, like the act of 1864, entitled "An act to provide a national currency, secured by a pledge of United States stocks, and to provide for the circulation and redemption thereof." (Ch. 58 of 3d Sess. of 37th Congress, Laws of Congress, 665.)

By the 62d section of the act of 1864, the act of 1863 was in express terms repealed, and all banks already established under the act of 1863 were declared entitled to all the rights and privileges granted, and subject to all the duties, liabilities and restrictions imposed by the act of 1864.

The act of 1864 thus superseded and took the place of the act of 1863, and the First National Bank of Albany, after the repeal of the act of 1863, depended for its existence and continuance entirely on the act of 1864; though first put in operation under the act of 1863, its organization was continued and kept up under the act of 1864.

The objection made is purely technical, and depends on giving a very narrow construction to the meaning of the word "organized." It is certain the legislature intended no such construction, but, on the contrary, intended to subject the shareholders of the national banks to the same tax, and it is believed those which commenced business under the act of 1863, as well as those which commenced business under the act of 1864, are covered by the provisions of the enabling act. They are all organizations now existing and operating only by virtue of the act of 1864.

VIII. The judgments in both cases should be reversed, and judgments be rendered for costs against the plaintiffs.

If it should be considered a doubtful question, the assessors should be left to collect the assessments; for a case must be made out affirmatively to authorize an interference by injunction.

And if there is doubt upon the question, it is suggested that the defendants ought to have judgment, for the plaintiffs only can appeal to the Supreme Court of the United States; and it is desirable that the judgment of that tribunal should be obtained, that the administration of the law may be uniform in all the States.

DENIO, Ch. J.   The appeals in these three cases were heard together, and the general question in each is, whether the shares of the stockholders in the banking associations created under the acts of congress, which provide for the creation of national banks, can be subjected to taxation by State authority.

In the first case, the institution whose stockholders were taxed, was established on the 4th day of January, 1864, with a capital of $200,000, the whole of which was invested in the securities of the public debt of the United States. The plaintiffs and other shareholders were taxed by the common council of the city of Utica, in September, 1864, as for so much personal property as their respective shares in the stock of the bank represented.

In the second case, the institution is the First National Bank of Albany, which was established in February, 1864,

with a capital of $300,000, the whole of which, and a considerably larger sum, is invested in similar national securities. Its shareholders, of whom the plaintiff is one, were assessed upon the respective amount of their shares between the months of April and September in the present year.

In the remaining case, the bank is the National Albany Exchange Bank, and it was established in January, 1865, with a capital of $300,000, all of which is invested in federal securities. The plaintiff is a shareholder, and, with the other shareholders, has been taxed during the present year, in the same manner as in the other cases. The defendants in these two actions are the individuals who constitute the board of assessors of the city of Albany.

Each of the three actions came before the Supreme Court, upon cases agreed upon, pursuant to the 372d section of the Code of Procedure, for the purpose of determining whether the parties who had been assessed and taxed, were legally liable to such taxation. The plaintiffs proceeded in behalf of themselves and all other stockholders of their respective banks.

In the first case, the decision of the Supreme Court was, that the plaintiff Churchill was liable to the tax, his residence being in the first ward of the city of Utica, in which ward the bank was located; and that the other plaintiffs were not liable on account of their residences being without that ward. Judgment was given accordingly, and costs were awarded to the prevailing parties.

In the two other cases, the taxes were adjudged to be illegal, and judgment was given in favor of the respective plaintiffs; and it directed that the names of the several stockholders be stricken from the assessment rolls.

Appeals have been taken to this court by all the parties against whom the judgments were rendered.

The taxes in all the cases are challenged as illegal on two principal grounds: first, that the banking institutions are creations of the federal government, and are instrumentalities provided by the national legislature to execute the powers granted to it by the Constitution, and secondly, that the

capital of these banks having been invested in securities of the public debt of the United States, which securities have been determined not to be liable to State taxation, the taxation of the shares is an act hostile to that immunity, and destructive of it, and that such taxation is consequently illegal and void.

As to the first position, it is incontestable that property wholly devoted to public uses by the general government, cannot be subjected to the taxing power residing in the governments of the States of the Union. Independently of the cases which have been adjudged in the federal courts, it is perfectly plain upon principle, and it results inevitably from the system of the Constitution, that the national institutions and establishments of every kind, which have been brought into existence by laws constitutionally enacted by the national legislature, exist independently of the State governments, and cannot be made tributary by means of State laws for taxation, or in any other manner to the needs or exigencies of the State governments. This results necessarily from the preëminence which must always belong to an imperial government, over the subordinate and local governments which are embraced within it, though these may be sovereign in respect to all subjects not committed to the common sovereignty, which, within its assigned sphere, rightfully dominates over them all. This preëminence is moreover cautiously defined and guaranteed by the provision of the Constitution, which declares that itself and all the laws of the United States which shall be made in pursuance of it, shall be the supreme law of the land, and above and superior to all State constitutions and laws. Hence, no man would, for a moment, claim that the taxing power of the State could be exerted against the public money in the treasury, the precious metals in the mint, or the lots, structures, ships, material of war, or other property devoted to public purposes by the general government. It was, no doubt, carrying this conservative principle to its extreme limits, to class the late Bank of the United States among the instrumentalities for carrying on the government of the United States.

That institution, although for most purposes, it was concerned in the private business of the citizens of the United States, was yet charged with public duties of great importance. The government owned seven millions of its thirty-five millions of capitol, and appointed five of its twenty-five directors; and it contributed a million and a half of its funds to the public resources. It was made subject to the visitation of the secretary of the treasury, and was bound to obey his orders for transferring the public funds, without charge for exchange, to all parts of the United States and the federal territories. (3 Story's Laws, p. 1547.)  These features of its charter enabled the Supreme Court of the United States to pronounce that it was an instrument necessary and proper for carrying into effect the power vested in the government of the United States, and that it was of the same character, so far as the power of congress to create it was concerned, as the other public institutions, such as the mint, the post-office and the like. (*McCullough* v. *The State of Maryland*, 4 Wheat., 316; *Osborn* v. *The United States Bank*, 9 id., 738.)  It followed inevitably from this determination, that the United States Bank was no more subject to State taxations than any other of the great departments of the public administration.  That this was the view taken by Chief Justice MARSHALL is apparent from the whole scope of his reasoning, in the masterly opinions prepared by him in the two cases to which I have referred; and it is pointedly manifested in the part which I will now quote from the opinion in the last of these cases.  Speaking of the argument of the counsel opposed to the bank, that the corporation was established for the management of an individual concern, and was founded upon contract between individuals, and having private trade and private profit for its great end and principal object, he said: "If these premises were true, the conclusion drawn from them would be inevitable.  This mere private corporation, engaged in its own business with its own views, would certainly be subject to the taxing power of the States as an individual would be; and the casual circumstance of its being employed by the government in the transaction

of its fiscal affairs, would no more exempt its private business from the operation of that power, than it would exempt the private business of any individual employed in the same manner. But the premises are not true. The bank is not considered as a private corporation, whose principal object is individual trade and individual profit, but as a public corporation created for public and national purposes. That the mere business of banking is in its nature a private business, and may be carried on by individuals or companies having no political connection with the government, is admitted; but the bank is not such an individual or company. It was not created for its own sake or for private purposes. It has never been supposed that congress could create such a corporation."

But the Bank of the United States, equally with the banks involved in these cases, besides its public aspect as an instrument of the federal government, was a trading corporation. The citizens were not only permitted, but invited to invest their moneys in its stock, for the purposes of their individual profit, and the community at large was expected to transact a large portion of its own pecuniary business by means of its agency. The faculty to transact that business, and the contribution to its funds by its private stockholders, was necessary in order to render it a useful instrument to the government in the transaction of its business. Without this connection with the general business of the country it would be a mere inanimate body, useful, no doubt, to a certain extent, as a depository of the public moneys, but incapable of subserving the great public purpose for which it was created. Its connection with the general trade of the country constituted, in the language of the chief justice, its vital spirit, which alone gave it a useful existence. But these individual means, invested in the stock by the private stockholders, were, before such investment, the proper and legitimate subject of State taxation. There was certainly no reason why they should cease to be subject to that liability after they were thus invested, unless such immunity was essentially necessary to the existence and preservation of the corporate body with which they were con-

nected. It is argued that they were and are so necessary; that if the liability to taxation on the means so invested be sustained, it will be in the power of the State governments to tax them so inordinately as to wholly destroy them. The argument drawn from the possible abuse of a power clearly legitimate, except on account of such liability to abuse, is carried quite too far, and is not justified by the circumstances of the case, or the common experience of mankind. The State taxes all the private property of its citizens invested, as they frequently are, in partnerships and associations, and in other business arrangements in connection with other individuals and corporations; and yet it has never been considered that the power so to tax was antagonistic to any of those other arrangements of business which are tolerated and sometimes encouraged by the laws. There is, in truth, no practical repugnancy between the exercise of this power of taxation and the integrity of the institutions and business arrangements in which the property so taxed is invested and mixed. A malicious exercise of the taxing power, in such cases, might no doubt produce mischief or inconvenience, as might the gross abuse of any other of the powers reserved to the States; but so long as the property thus invested is only taxed in common and equally with other individual property, as is done in the taxing laws of this State, the apprehension of danger is purely fanciful.

It was the consideration of the mixed character of the purposes for which the Bank of the United States was incorporated, and the twofold character of its operations, and of the interests it was intended to promote, which led the Supreme Court of the United States, in determining the question of the liability of that institution to taxation, carefully to discriminate between the interests of the individual shareholders, which represented their private investments in the stock, and the corporate body itself. From the nature of the case, and the consideration that the judgment was to operate in every State in the Union in which the bank and its branches were located, or in which any of its stock might be held, it was eminently proper, and indeed essential, that the court

should define the precise subject which should be exempt from
the taxing power of the States, and that which should remain
liable to contribute to the burthen of sustaining the State insti-
tutions. · We accordingly find, at the close of the opinion of
the chief justice, which was adopted as the opinion of the
court, the following cautious qualification: "This opinion
does not deprive the States of any resources which they
originally possessed. It does not extend to a tax paid by the
real property of the bank, in common with the other real prop-
erty within the State, *nor to a tax imposed upon the interest
which the citizens of Maryland may hold in this institution
in common with other property of the same description through-
out the State.* But this is a tax on the *operations* of the bank,
a tax on the operations of an instrument employed by the
government of the Union to carry its powers into execution.
*Such a tax* must be unconstitutional." (4 Wheat., 436.) If
this qualification was proper to be made in respect to the
Bank of the United States, in which comparatively few of
the citizens of the country were interested as stockholders, *a
fortiori*, it is applicable to the national banks established by
the recent legislation of congress, which are designed to and
practically will supersede the State banks, and absorb the
whole of the funds and property of all the people of the
Union which shall be invested in the business of corporate
banking. The idea of withdrawing all these immense pecu-
niary means, constituting a very large proportion of all the
personal property of the nation, from the duty of contributing
to sustain the State governments, whose sphere it is to enact
and administer all the laws and institutions which regulate
the acquisition, enjoyment and transmission of property,
and the administration of justice and the conduct of State and
local government, would be frightful to contemplate. We
cannot yield to the argument that the qualification which
the court annexed to its opinion was a mere dictum of the
chief justice, which we are at liberty to disregard. In the
first place, it is in consonance with our own convictions of
what is the necessary result of the principles upon which the
court proceeded. But principally, we think we ought to ad-

here to it as a part of the judgment which the court was called upon to pronounce.  The powers of the national and of the State governments were examined and investigated to their very foundations, with a thoroughness which few other questions have ever undergone.  A rule was to be adopted, with its necessary limits and qualifications, which was ever to be the guide of all the courts, State and national, and of all the people of the Union for all time to come.  That rule was adhered to during the whole period of the existence of the bank, and it is believed that it has been recognized as settled constitutional law, from the time the judgment was pronounced to the present day, a period of nearly half a century.  We do not feel at liberty to depart from it in the judgments to be given in these cases.

A provision in the act of congress under which these banks were established, appears to us directly to lead to the same result.  The clause in that act subjecting the shareholders in these banks to State taxation, has a close reference to the qualification contained in the opinion of the chief justice, and was no doubt suggested by it; but as it is to be immediately examined in connection with the questions next to be considered, we merely refer to it here.  We close our observations on this topic by a reference to two cases in which the power to tax the shareholders in the Bank of the United States, under State authority, has been affirmed. (*Bulow* v. *The City of Charleston*, 1 Nott & McCord, 527; *State* v. *Collectors*, 2 Bailey, 654.)  And we conclude, with entire confidence, that there is no impediment to the taxation of these shareholders, arising out of the consideration that the banking corporations are not themselves taxable.

It remains to consider whether the circumstance that the national banks, whose stockholders are before us, had invested their capitals in federal stocks, exonerates them from State taxation.  It is an essential prerequisite in the constitution of these banks, that before the commencement of their banking business, they shall own, and shall deposit with the treasurer of the United States, an amount of the registered bonds of the public debt to at least one-third of their respective

capitals, and in no case less than the amount of thirty thousand dollars. (Laws 38th Cong., 1st Sess., ch. 106, § 16.) It must, therefore, be steadily kept in mind, in examining the other provisions of the act, that the congress was creating and dealing with moneyed institutions, which must, according to the very law of their existence, possess at all times a large amount of these national securities, and which institutions might own them in much larger proportions. The act of congress to which reference has already been made, contains provisions in the following words: "Provided that nothing in this act shall be construed to prevent all the shares of any of the said associations, held by any person, or body corporate, from being included in the valuation of personal property of such person or corporation, in the assessment of taxes imposed by or under State authority, at the place where such bank is located and not elsewhere, nor at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of this State. Provided further, that the tax so imposed under the laws of any State upon the shares of the associations, authorized by this act, shall not exceed the rate imposed upon the shares of any of the banks organized under authority of the State where such association is located. Provided also, that nothing in this act shall exempt the real estate of associations from either State, county or municipal taxes to the same extent, according to its value, as other real estate is taxed." (§ 41.)

It is not shown that any of the bonds held by these banks, were actually issued by the government prior to the passage of the act above mentioned. The bonds contained, it is true, provisions on their face exempting them from State taxation, but this, I presume, did not add anything to the immunity in that respect which they enjoyed under the Constitution, as settled by the federal judiciary. But if it should be considered otherwise, and that the taxing of the shareholders is in any proper sense a taxing of the bonds, then as to all those which were issued subsequently to June 3, 1864, the lenders who received them must be considered as entering into the transaction with a knowledge of, and subject to all the pro-

visions of the public law by which the exemption expressed
on their face was qualified, including the aforesaid provision
of the act passed on that day, which has just been mentioned,
and thus considered, the terms of the exemption will be that
they shall not be taxable under State authority, except that
if they become parcel of the capital of a banking association,
the shareholders shall nevertheless be taxable on their shares,
in common with other personal property of the citizen, with
a limitation of the rate of taxation, as mentioned in the
proviso.

I need not spend time to show that the fact that the exemp-
tion is expressed by way of proviso, does not impair the face
of the enactment. It is in substance a declaration of the
supreme legislative authority of the Union, that the bonds
may be taxed against the shareholders (if taxation of the
shares is a taxing of the bonds) when they are made parcel
of the capital of a national bank.

But we are of opinion that the assessment and taxation of
the shares of a banking corporation is not a taxing of the
property in which the capital of the bank has been invested.
The shares of these banks are personal property. The stock
is a species of chose in action, or an equitable interest which
the shareholder possesses, and which he can enforce against
the corporation. The shareholder is not the owner of the pub-
lic stock possessed by the corporation, any more than he is
the owner of the discounted notes, or other securities held
by the bank. He is not the owner of either. He is only
entitled to participate in the net profits earned by the bank,
and upon its dissolution to have his proper proportion of
what may remain after payment of its debts. A little reflec-
tion will show this to be so. Suppose the capital to be
invested, partly in stocks, and, in part, of other moneyed
securities. If he has a proprietary interest in the public
stocks, he has, as I have said, an equal property in the other
securities. As to the latter, there is no possible objection
to the taxation. Now the assets of a bank are constantly
fluctuating. A national bank must own the amount of the
stocks required to be deposited with the treasurer. As to

any further amount, the bank may own it one day and part with it the next. If the shareholder is taxed on the footing of a part owner of the assets, a problem must be solved on each occasion on which the assessment is made, to ascertain what aliquot proportion of the whole assets, deducting the debts, consists in this exempt stock, and the tax must be a fractional part of each share, which would generally be a perfectly impracticable operation. A shareholder has, no doubt, a certain interest in all the property of the corporation. What I contend for, is, that it is not the interest of an owner of the property which the bank possesses. If any party, except the corporate body, has the interest of an owner, the creditors have such an interest. Neither they or the stockholders can touch an item of the property. They cannot transfer or incumber it. They have none of the powers of disposition which are incident to the ownership of property. If there is anything which assimilates the interest of the creditors and shareholders to that of owners, the creditors certainly approach nearest to that character, for they are first entitled to be paid; and in case of insolvency, the proceeds arising from the conversion of the assets are to be first applied to the payment of their demands. Now, when the constitutional inhibition, as construed by the courts, or the express provision contained in the laws providing for loans, speak of the bonds as not liable to State taxation, the meaning is, that the owners of these bonds are thus exempt, not that all persons having a collateral interest in them are exempt. The expression is elliptical, for the idea of taxing a note or bond, distinct from its ownership by some person, natural or artificial, is of course an absurdity. The owner is taxed in respect to the bond or on account of its ownership by him. If I am right in considering the banks as the owners of the bonds, and the shareholders as having a collateral interest respecting them, on account of their title to share in the profits, then it is the banking corporation, and not the shareholders or creditors, which are entitled to claim the exemption.

The Court of King's Bench has, in a recent case, taken the same view respecting the ownership of the shareholders in

the property of a corporation. The British acts of parliament forbid the registry of a ship as a British vessel unless it is *wholly* owned by British subjects. If a part owner is not a subject, it cannot be registered. A mandamus was sued out to compel the registry of a vessel owned by a British corporation, some of the shares in which were owned by foreigners. The judgment was for the plaintiff, sustaining its right to a registry. Lord Chief Justice DENMAN said: " It appears to us that the British corporation is as such the *sole owner* of the ship. * * * The individual members of the corporation are no doubt interested, in one sense, in the property of the corporation, as they may derive individual benefit from its increase, or loss from its destruction; but in no legal sense are the individual members the owners." (*The Queen* v. *Arnaud*, 9 Adolph. & Ellis, N. S., 806.)

I do not consider the case called " *The Bank Tax Case*" (reported in 2 Wallace, 200), as at all hostile to the conclusion above expressed. This court had held that the Bank of the Commonwealth was taxable, without regard to the amount it had invested in federal stocks, under an act of the legislature of this State, passed in the year 1863, which declared that all banks, banking associations, and other moneyed corporations and associations should be liable to taxation on a valuation equal to the amount of their capital stock paid in or secured to be paid in," &c., "in the manner provided by law." We considered the tax thus provided for, to be imposed upon the corporation as a legal being, wholly irrespective of the securities in which its capital might be invested. We found that under a former system of tax laws, contained in the Revised Statutes, such had been repeatedly adjudged to be the rule; and that if the bank had lost a part of its capital, or had added to its assets by an accumulation of profits, it did not in any manner affect the amount for which it was taxable. (*The Bank of Utica* v. *The City of Utica*, 4 Paige, 399; *The People* v. *The Board of Supervisors of Niagara County*, 4 Hill, 203; *The Farmers' Loan and Trust Co.* v. *The Mayor*, &c., 7 Hill, 261; *The Oswego Starch Factory* v. *Dolloway*, 21 N. Y., 449.) This was a point, as

will be seen by these cases, well settled in this State. The law, thus adjudged, we understood to be concurred in by the Supreme Court of the United States, or, at least, by the eminent judge who prepared the opinion of the court in the case reported in Wallace, in a part of his opinion in the former case of *The Bank of Commerce* v. *New York City*, reported in 2 Black., 620. He there said that, according to the former system of taxation, meaning that which was contained in the Revised Statutes, banks were taxed on their nominal capital, without regard to loss or depreciation. "According to that system of taxation," he said, "it was immaterial as to the character or description of property which constituted the capital, as the tax imposed was wholly irrespective of it. The tax," he added, "was like one annexed to the franchise as a royalty for the grant." We were of opinion that the intention of the act of 1863 was to return to that system, and if we had been correct in that assumption, it certainly would have followed that it was immaterial whether the capital was invested in United States bonds or any other securities. The determination in the *Bank Tax Case*, by which our judgment was reversed, proceeded upon the ground that we had misconstrued the act of 1863, and that it was not a tax on the banks, nominally, which was intended, but was a tax upon their property and assets, valued by an artificial standard. If our act of 1863 had declared the tax to be imposed upon the amount of the nominal capital, *irrespective of the mode of its investment* when the tax came to be assessed, we suppose our judgment would have been affirmed, instead of being reversed.

It is argued that the congress had not the constitutional power to enact the provisions contained in the bank act of 1864. The argument is, that as the Constitution had exempted public stocks from taxation by the States, it was not in the power of congress to subject them to such taxation. It is material to remember that there is no language of the Constitution to that effect. But the Supreme Court has considered that the exertion of the taxing power of the States upon these securities would, or might, impair the

ability of the government to raise money by loan for public purposes, and hence would be hostile to the congressional power to borrow money; and it is easy to see that the faculty of borrowing upon securities which should enjoy that immunity, might in some degree promote the negotiation of loans. But, is this an advantage which may not be waived by the national legislature? There are, frequently, other public objects connected with a loan beyond the mere purpose of realizing the amount required to be borrowed. One purpose of the government, organized by the Constitution, is declared to be to promote the general welfare of the people of the United States. No doubt the maintenance of the State governments, to which the possession of pecuniary means to be acquired by taxation is essential, is intimately connected with the general well-being of the people. Suppose, then, congress should come to the conclusion that the placing of the general government, in respect to a loan, upon the same footing with other borrowers, would not essentially affect the ability to negotiate such loan, while it would greatly conduce to sustain and promote the interests of the State governments in their pecuniary arrangements, and would moreover more effectually secure domestic tranquillity, which is another object aimed at by the Constitution, is the supreme legislature powerless in the premises? I cannot believe that such is the case. The inhibition of the States to tax the money of their citizens invested in national loans, is predicated of the power to borrow money on the credit of the United States. It is a power conferred in the same general terms as the power to regulate commerce, and it has frequently been decided in the Supreme Court of the United States, and in this court, that an act of a State legislature, having the effect of a commercial regulation, is not a violation of the Constitution, if congress has not exercised their undoubted authority over the subject in the particular case. (*Wilson* v. *The Black Bird Creek Swamp Company*, 2 Peters, 250; *Sturges* v. *Crowningshield*, 4 Wheat., 193; *Moore* v. *Housten*, 5 id., 1; *Cooley* v. *The Board of Wardens of Philadelphia*, 12 How., 299; *Lemmon* v. *The People*, 20 N. Y., 562, 613.) If by

omitting to legislate on the subject, the States are left free to act, *a fortiori*, an express permission to the States to act, would not be objectionable.   In the *Pilot case*, above referred to from 12 Howard's reports, the State of Pennsylvania had passed an act for the regulation of pilots.  It was shown in the opinion in the case, that this State law was in substance a regulation of commerce.   But congress had never assumed to enact a pilot system; but the several maritime States had generally done so, and congress had, at an early day, passed an act declaring that pilots should continue to be regulated "by such State laws may respectively hereafter enact for that purpose."   The pilot act of Pennsylvania was declared to be valid, on the ground that congress could waive, in favor of the States, the right which the Constitution had conferred upon it by the power to regulate commerce.  I consider this a strong precedent for holding that the national legislature is competent to waive the right, which under the decisions of the federal court it possesses, to provide for the negotiation of loans, which shall not clothe the securities with an exemption from State taxation.   If, therefore, it could be held, that the taxation of these shares was the taxing of the bonds which the corporations hold, I should yet think that the taxation was lawful under the permission contained in the banking law of the United States.

It is further urged that these shareholders are taxed at a rate beyond the limits prescribed in the *proviso* in the act of congress.   We do not perceive this to be so.   The stock is assessed at the amount represented by the shares respectively. It is not shown that they are not of that value.   Then the tax is at the same rate per cent as other moneyed capital in the hands of individual citizens.   Our laws do not authorize the taxation of shares in banks organized under the authority of this state.   We tax our domestic banks on their capital pursuant to the act of 1863, and it is presumed that the taxing officers conform to the judgment in the *Bank Tax Case*, reported in 2 Wallace, by deducting the part invested in United States bonds.   This exemption is made because the banks which are taxed are the owners of these bonds.   But

we have shown that these shareholders are not the owners of the bonds held by the banks.

There are some questions which are not common to all these banks. In the first case the bank was established, and the taxes which are challenged were imposed prior to the enabling statute of this state, which was passed and became a law on the 9th day of March, 1865. Only one of the plaintiffs resided in the ward of the city of Utica in which the bank is situated. The principles which have thus far been stated, show that he was legally taxed. Of the other parties taxed, one resided in another ward of the city, one in the same county, another in another county of this State, and the remaining one in the District of Columbia. Our laws, prior to the enabling act, required that the taxation of personal property shall be in the town or ward in which the tax payer resides. I was at first inclined to the opinion that the provision of the national banking law, so often referred to, might be considered as a change of our own law, and might be sustained on account of its relation to the national banks which are within the sphere of federal legislation. On further reflection, I have concluded that it would be more correct to hold that the effect of the *proviso* is to permit the States so to shape their laws of taxation as to tax all the shareholders at the place where the bank is situated, as has been done by the enabling act.

It follows that the judgment of the Supreme Court, in favor of the plaintiff against Mr. Churchill, should be affirmed, and that the judgment in favor of the other defendants in that case should likewise be affirmed.

In the second case, the bank was established prior to the passage of the enabling act just mentioned, and, also, prior to banking act of congress, approved June 3, 1864. The enabling act, which authorizes the taxation of shareholders otherwise than in the place of their residence, declares that " all the shares of any of the banking associations organized under this act, or the act of congress mentioned in section one of this act," shall be assessed and taxed in the town or ward in which the bank is located (Laws 1865, ch. 97, § 10),

and the act of congress mentioned in that first section is the act of congress of June 3, 1864. The First National Banking Act was passed February 25, 1863 (37th Cong., Sess. 3d, ch. 48), and it was consequently under that act that the First National Bank of Albany was organized. This would be conclusive in favor of such of the shareholders of that institution as reside out of the proper ward of the bank, were it not that a section of the act of 1864 (the 62d) provides that all the banking associations organized under that former banking act, which is in terms repealed by that section, should enjoy all the rights and privileges granted, and be subject to all the duties, liabilities and restrictions imposed by that act of 1864. I am of opinion that when the New York enabling act embraced within its scope all the associations organized under the act of 1864, it included, by a reasonable construction, these associations which, although first established under the earlier act, were continued and confirmed by the banking act of 1864, and which stood at the passage of the New York act, solely upon the last banking act of the United States.

Hence, the judgments in the second and third of the above entitled cases must be reversed; and it must be declared, as the judgment of this court, that the taxation of the shareholders, mentioned in the cases agreed on in these actions, were legal and valid.

The costs in each of the appeals are awarded in favor of the prevailing parties.

The form of the judgment is to be settled by one of the judges (unless agreed on by the parties), in order that a proper clause may be inserted, showing that a question arising under the Constitution of the United States was involved in this decision.

All the judges concurred in these conclusions, except that Porter, J., did not sit in the last mentioned case, on account of interest in the bank concerned in it.